**CLARKE et al. v. UNITED STATES et al.**

Civ. A. 2834–51.

United States District Court
District of Columbia.

Oct. 31, 1951.

Glenn F. Morgan, Chester E. King and Frederick R. Hanlon, all of Washington, D. C., for plaintiffs.

H. G. Morison, Asst. Atty. Gen., James E. Kilday, John F. Baecher, Special Assts. to Atty. Gen., George Morris Fay, U. S. Atty., Washington, D. C., for the United States.

Daniel W. Knowlton, Chief Counsel, J. Stanley Payne, Asst. Chief Counsel, Washington, D. C., for Interstate Commerce Commission.

Homer S. Carpenter, Washington, D. C., for Intervener.

Before PRETTYMAN, Circuit Judge, and KEECH and KIRKLAND, District Judges.

589

PRETTYMAN, Circuit Judge.

This is a civil action brought by plaintiffs, to whom we shall refer as "Clarke" and "Atwood", respectively, seeking to have an order of the Interstate Commerce Commission enjoined and then vacated and set aside. Richmond-Greyhound Lines, Inc., which we shall call "Greyhound", intervened in the trial court. The order which is the subject matter of the suit was entered by the Commission February 5, 1951, and granted to Greyhound a certificate of public convenience and necessity authorizing operation, as a common carrier by motor vehicle of passengers, over a certain route in southern Maryland as an alternate route for operating convenience only, serving no intermediate point.

Discussion of the controversy requires a brief preliminary geographical description. A road, Maryland Automobile Route 5, extends southeast from Washington through several towns in Maryland. From a point beyond Mechanicsville this road proceeds in an irregular arc through Morganza, Leonardtown and Callaway to Lexington Park, a terminal point, where the Patuxent Naval Air Station is located. In recent years a short-cut road—Route 235—from Mechanicsville to Lexington Park, across the base of the arc in the other road, has been improved. The route by this road from Lexington Park to Mechanicsville is eight and a half miles shorter than is the route by the other road. The whole area is on a peninsula, so that the principal traffic is back and forth to Washington.

The present situation is that Atwood operates a bus service from Lexington Park via the short-cut Route 235 to Mechanicsville and thence to Washington; Greyhound operates a bus service from Lexington Park over the longer route via Leonardtown to Mechanicsville and thence to Washington. The certificate granted Greyhound by the Commission in the order here involved is for operation over the short-cut, Route 235, but without pick-up or discharge of passengers over this short-cut portion of the route. Greyhound says that the certificate is merely for an alternate route. Atwood says that the certificate is for a new service and that, moreover, necessary findings of fact are lacking in the Commission's determination.

The present situation developed from a series of events. Prior to World War II the only bus service in this area was the Greyhound service over Route 5 to and from Leonardtown. During the war the Government established the Patuxent Naval Air Station. Greyhound extended its service from Leonardtown to Lexington Park. There was traffic enough for two carriers. Clarke applied for and obtained a certificate for operation, and since the road which is now Route 235 had recently been improved his application and certificate were for operation by that route. Atwood is Clarke's lessee. Upon the termination of the war the traffic dropped off. Greyhound says that the traffic over its route, Route 5 via Leonardtown, is not sufficient to maintain the service. It seeks authority to operate by the short route in order to get a larger proportion of the through traffic between Lexington Park and Washington, claiming that the additional traffic and the shortened mileage will bring its net finances to a level which will permit the maintenance of the local service to the towns along the long route.

There is a long history of proceedings before the Commission. It appears that Greyhound's original application was for an operation over the short route, now occupied by Atwood, as a full service. Thus viewed, the application was for authority to institute a new service, and it was necessary, therefore, for Greyhound to show a public need for that service. Upon that basis the application was denied. Greyhound then announced that it would accept a certificate for the short route operation without any service to intermediate points. Such an operation, it maintained, was merely an alternate route to its established route and, as such, could be granted upon a showing of economies to be derived. Upon this basis the Commission, both Division 5 and the full Commission, granted the application.

In its report the Commission recited, among other things, that there is no inadequacy in the existing service between Washington and Lexington Park, that

Greyhound has for a number of years transported a substantial volume of that traffic, and that the use of the short alternate route will enable Greyhound to effect operating economies and so provide an improved service to points on its established route. The Commission made no reference to the effect upon Atwood of the grant of the certificate to Greyhound. The nearest approach to a reference to the effect upon Atwood appears in the second report of Division 5 upon reconsideration, which was the decision ultimately approved by the full Commission. Division 5 said, among other things: "Under these circumstances, and based on all the facts of this record, we are now convinced that public convenience and necessity require that applicant be permitted to use Maryland Highway 235 in operating between Washington and Lexington Park. This would aid in the restoration of the stability of applicant's general operations in Southern Maryland, remove the dangers of impairment of applicant's services elsewhere in Southern Maryland, particularly at and around Leonardtown, and place the competitive situation on a more normal and sound basis."

■ We think it was necessary for the Commission to make definite findings of fact as to the effect upon Atwood of the grant of this certificate. For reasons which we shall detail in a moment we think that the reference in the last clause of the above quotation from the Division 5 report does not meet that requirement.

Reference to the opinion and decision of the Supreme Court in American Trucking Associations v. United States [1] is sufficient to dispose of the problem as it is presently before us. There are differences of fact between that case and this one but, we think, no material difference in the applicable principles. In that case the receivers of the Seaboard Air Line Railway sought certificates for the operation of motor trucks as auxiliary to and supplemental of the railroad operation. The Court held that in such case "the Commission must weigh the advantages of improved rail traffic against the injury to the over-the-road motor carriers to determine where public convenience and necessity lies" and that receipt and consideration of evidence of the effect of the proposals upon the protestants was an essential part of that task. The Court reversed the judgment of the District Court which had affirmed the Commission.

While, as we have said, we think reference to that opinion is sufficient for present purposes, the fact that that case concerned supplemental motor operation by a railroad, while the present case concerns alternate route operation by an existing motor carrier, makes proper a further examination to make sure that the same principles apply.

■ Discussion of the controversy should proceed from certain basic principles of public utility regulatory law. The first such principle is that, if there be traffic enough for only one carrier, only one carrier will be certificated. The public interest in that situation is for service. Only if there be traffic enough to support efficient operation by more than one carrier does the public interest require the competitive operation of two carriers. [2] In Texas & P. Ry. Co. v. Gulf, Etc., Ry., [3] the Supreme Court said that in the Transportation Act of 1920 Congress "recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers is a matter of national concern; that the property employed must be permitted to earn a reasonable return; that the building of unnecessary lines involves a waste of resources and that the burden of this waste may fall upon the public; that competition between carriers may result in harm to the public as well as in benefit; and that when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss." [4]

1. 1945, 326 U.S. 77, 83–86, 65 S.Ct. 1499, 1503, 89 L.Ed. 2065.

2. Chesapeake & Ohio Ry. Co. v. United States, 1931, 283 U.S. 35, 42–43, 51 S. Ct. 337, 75 L.Ed. 824.

3. 1926, 270 U.S. 266, 277, 46 S.Ct. 263, 266, 70 L.Ed. 578.

4. See also the reference in Federal Communications Commission v. Sanders Ra-

■ The foregoing principle appears in various forms in different cases. It is sometimes said that a certificate for a new service will not be granted unless a public need for the service appears. In other cases it is said that where there is an outstanding certificate for a service another certificate will not be granted unless it is shown that the existing service is inadequate. This principle, if applicable to the present controversy, would mean that, unless there is a public need for another service, or unless the service being rendered by Atwood is inadequate, another certificate to another carrier for service between Lexington Park and Washington should not be granted. If the traffic between those points is enough to preserve the financial stability of only one carrier, the presence of two carriers and the competition between them would inevitably result in the deterioration of service, to the injury of the public.

■ The second basic principle involved in this controversy is that if economies in operation are possible the public interest requires such economies. The public interest is not only in efficient service but is also in reasonable rates for that service. So, if the carrier is operating over an established route, but it appears that it can render the same service or a better service by a shorter or cheaper route, the public interest requires the more economical operation.

In the practical administration of regulatory measures the two foregoing principles must frequently be adjusted one to the other. Thus the distinguishing terms "new service" and "alternate route" have been developed. It is said, in cases, that to obtain a certificate for a new service public need must be established; and it is said that in applying for a certificate for an alternate route it is sufficient to establish operating economies. But these short forms of expression do not eliminate the full applicability of the general principles. Thus, in Interstate Commerce Commission v. Parker,[5] upon which the opinion and decision in American Trucking Associations v. United States, supra, were based, the Court pointed out that the Commission made these findings: "The motor-carrier service proposed by applicant, operated in close coordination with the railroad's service, will effectuate a reduction in cost, and will result in an increase in efficiency in the transportation over the routes herein considered, which will inure to the benefit of the general public. Furthermore, it does not appear that the restricted service would be directly competitive or unduly prejudicial to the operations of any other motor carrier. . . ." The Court emphasized the latter phase of the situation; for example, it said:[6] "The public is entitled to the benefits of improved transportation. Where that improvement depends in the Commission's judgment upon a unified and limited rail-truck operation *which is found not 'unduly prejudicial' to motor carrier operations,* the Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service." (Italics supplied.) This feature of the Commission's determination is one of the underlying factors in the doctrine of that case, as the later decision in American Trucking Associations makes clear.

The Commission has applied this doctrine many times. In Greyhound Corp. Extension of Operations—Bangor, Maine,[7] the Commission had before it an application

dio Station, 1940, 309 U.S. 470, 474-475, 642, 60 S.Ct. 693, 697, 84 L.Ed. 869, where the Court, describing the regulatory scheme for radio, epitomized the contrasting principle applicable to railroads and said: "The sections dealing with broadcasting demonstrate that Congress has not, in its regulatory scheme, abandoned the principle of free competition, as it has done in the case of railroads, in respect of which regulation involves the suppression of wasteful practices due to competition, the regulation of rates and charges, and other measures which are unnecessary if free competition is to be permitted." See also Texas v. United States, 1934, 292 U.S. 522, 54 S.Ct. 819, 78 L.Ed. 1402.

5. 1945, 326 U.S. 60, 68, 65 S.Ct. 1490, 1494, 89 L.Ed. 2051.

6. Id., 326 U.S. at page 70, 65 S.Ct. at page 1495.

7. 33 M.C.C. 517 (1942).

by Greyhound for a certificate to operate between Belfast and Bangor over a shore route, it already having a certificate to operate between the same two points over an inland route. Other carriers, principally the Maine Central, operated over the shore route. It was conceded that the operations of the existing carriers over the shore route were adequate. Greyhound urged that the proposed operation would effect substantial operating economies. To that contention Maine Central replied that operating economies for the applicant do not, alone, show a public need for the proposed service, and it emphasized that the applicant had failed to show that the proposed operation would not have an adverse effect upon its (Maine Central's) revenues. The Commission referred to the Dixie Ohio Exp. Co. case [8] and said: "Following the principle in this case, we are of the opinion that there is sufficient evidence of public convenience and necessity to warrant a grant of authority to operate over the proposed route, providing such operations will not impair the revenues of the existing motor carriers."[9] Examining the evidence the Commission found that during the summer months an extension of applicant's service over the shore route would not impair the revenues of Maine Central, but that during the balance of the year the applicant's operation would so intensify the competition for such little traffic as existed as to deprive Maine Central of traffic needed to sustain its then-present operations. Accordingly the Commission authorized a certificate to Greyhound for operation during the summer months only.

In Schultz Common Carrier Application,[10] the Commission said: "Generally, we have held that where the authorization of an alternate route, not involving service to additional points, will enable a carrier to render a more expeditious and economical service without adversely affecting the rights of any competing carrier, and thus more adequately serve the public, such au-

thority should be granted." In Axley Extension of Operations—Murphy, N. C.,[11] the Commission specifically found that "There is no showing that the granting of the application would be likely to jeopardize in any degree the quality of existing services * * *." In Motor Exp., Inc., Extension—U. S. Highway 71,[12] the Commission had before it an application by an existing carrier for the use of an alternate route, and it summarized the rule thus: "Where the granting of an alternate route, not involving service to additional points, will enable a carrier to render a more expeditious and economical service, and thus more adequately serve the public, without adversely affecting the rights of any competing carrier, such authority should be granted." [13]

The case of Cooper's Exp., Inc., Extension—Alternate Route [14] contains a carefully stated summary of the applicable rules. The Commission said: "We have consistently recognized a distinction between the measure of proof required to sustain the granting of an application seeking authority to improve an existing and competitively effective service and one seeking authority to institute a new service. In determining these so-called alternate route applications, the essential issue presented is whether applicant is actually engaged in the transportation of traffic, in substantial volume, between the termini of the proposed alternate or direct route and is at present in a position effectively to compete with other carriers for such traffic, or whether the new route will enable applicant either to institute a new service not theretofore conducted, or to institute a service so different from that theretofore provided as materially to alter the competitive situation to the injury of existing carriers. In the case of the former, we are justified in granting the authority sought solely upon proof that the proposed operation would result in operating economies, which, although primarily a benefit to the applicant,

8. Dixie Ohio Exp. Co. Extension of Operations—Bristol, 30 M.C.C. 291 (1941).

9. 33 M.C.C. at 520.

10. 34 M.C.C. 629, 638 (1942).

11. 30 M.C.C. 387, 390 (1941).

12. 29 M.C.C. 56 (1941).

13. Id. at 59.

14. 51 M.C.C. 411 (1950).

result in an indirect benefit to the public through the medium of more efficient service. In the latter case, however, where the use of the alleged alternate route would amount to the institution of a new service, or would provide applicant with a substantial competitive advantage not theretofore enjoyed, we must insist upon definite proof of a need for the proposed new service."[15] The applicant in that case had for a number of years been transporting freight between Boston and New York through Lawrence, Massachusetts, and Worcester, Massachusetts. It applied for authority to operate over a direct route from Boston to Worcester and thence to New York. The Commission found that the applicant could not be considered a new carrier, that the volume of traffic which it transported between New York and Boston had been substantial, and that the reduction in running time afforded by the proposed new route would not materially change the competitive situation to its advantage. Upon that basis it granted the application.

██ Upon all the foregoing it seems quite clear to us that where applications are made for alleged alternate routes the effect of the proposed operation upon existing carriers already using the proposed route is a material factor for consideration.

██ The Commission is the final arbiter of the public interest, and the function of a reviewing court is limited.[16] At the same time, as the Supreme Court said in Interstate Commerce Commission v. Parker,[17] the ultimate finding of public convenience and necessity must be based upon the proper statutory criteria and must have had the necessary factual findings to support it. "Public convenience and necessity is not defined by the statute. The nouns in the phrase possess connotations which have evolved from the half-century experience of government in the regulation of transportation. When Congress in 1935

amended the Interstate Commerce Act by adding the Motor Carrier Act, it chose the same words to state the condition for new motor lines which had been employed for similar purposes for railroads in the same act since the Transportation Act of 1920, § 402(18) and (20), 41 Stat. 477 [49 U.S.C.A. § 1(18, 20]. Such use indicated a continuation of the administrative and judicial interpretation of the language."[18] As the Supreme Court has said many times, we cannot exercise even our limited power of review unless the findings of fact are adequate to indicate that the Commission did consider those criteria which the law requires.[19]

In the record before us there are repeated references which indicate that there is not enough traffic over the routes here involved to maintain efficiently two carriers. But the Commission made no finding one way or the other on that point. Several witnesses expressed the fear that if the application were granted to Greyhound the result would be disaster for Atwood, but we do not have a finding upon that point. The examiner who presided at the second hearing found in his report: "The loss of any substantial number of these passengers would undoubtedly have a detrimental effect on Atwood's service which likely would result in the reduction of the number of schedules operated." The Commission made no finding in that regard.

Reference was made hereinabove to a clause in a sentence in the second report of Division 5 upon reconsideration to the effect that the grant of Greyhound's application would "place the competitive situation on a more normal and sound basis." The quoted statement is too cryptic to satisfy us that the Commission meant by it to find that there would be no adverse effects upon Atwood should the application be granted to Greyhound. Moreover, the expression comes at the end of a long discus-

15. Id. at 414–415.

16. United States v. Pierce Auto Lines, 1946, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821.

17. Supra, 326 U.S. at pages 64–65, 65 S.Ct. at page 1492.

18. This rule is implicit in McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544.

19. Colorado-Wyoming Gas Co. v. Federal Power Comm., 1945, 324 U.S. 626, 65 S.Ct. 850, 89 L.Ed. 1235, and cases therein cited.

sion of the situation entirely from Greyhound's viewpoint, and in its context seems to refer to the effect of the application upon Greyhound rather than to possible effects upon Atwood.

 Upon the foregoing considerations we are impelled to remand the case to the Commission for findings of fact as to the probable effect upon Atwood of the grant of the application to Greyhound, and for a redetermination of the ultimate question of public convenience and necessity in the light of the additional finding.

 Some question arises as to the burden of proof in respect to the effect of an application upon a protestant in a case such as the one before us. We think that, since the point is by way of opposition to the application, and also since the evidence is peculiarly within the control of the protestant, the burden of proving an alleged adverse effect should be upon the protestant. It follows that in the ordinary case the damage done by lack of such evidence would fall upon the protestant. In the present case, however, as we have pointed out, the original application of Greyhound was for a new service, and so the controversy originally concerned public need *vel non*. It was not until the record had been closed that the application was limited to an alternate route without pick-up service, and it was not until the change in the proposal that the issue of the effect on Atwood became critical. Under these circumstances, therefore, we think that the record should be reopened to permit Atwood to present such evidence as it may have to demonstrate the adverse effect, if any there be, upon it by reason of the grant of the application. Of course, as the Supreme Court pointed out in American Trucking Associations v. United States,[20] "The applicant [Greyhound in this case] will * * * be required to furnish needed statistical evidence which is reasonably available to it and will have opportunity to submit evidence upon its own part."

Remanded for further proceedings.

20. Supra, 326 U.S. at page 85, 65 S.Ct. at page 1503.

KIRKLAND, J., concurs.

KEECH, District Judge (dissenting).

I cannot agree with the conclusion reached in the majority opinion.

It is conceded by my associates that the function of the reviewing court is limited, that the Commission is the final arbiter of the public interest, that the court cannot substitute its judgment as to the requirements of public convenience and necessity and is without authority to intervene "unless in some specific respect there has been prejudicial departure from the requirements of the law or abuse of the Commission's discretion."[21]

As stated in Interstate Commerce Commission v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 1493, 89 L.Ed. 2051: "* * * The purpose of Congress was to leave to the Commission authoritatively to decide whether additional motor service would serve public convenience and necessity. Cf. Powell v. United States, 300 U.S. 276, 287, 57 S.Ct. 470, 476, 81 L.Ed. 643. This, of course, gives administrative discretion to the Commission, cf. McLean Trucking Co. v. United States, 321 U.S. 67, 87, 88, 64 S. Ct. 370, 380, 381, 88 L.Ed. 544, to draw its conclusion from the infinite variety of circumstances which may occur in specific instances." Again, in United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38, it is said: "* * * The Commission is the guardian of the public interest in determining whether certificates of convenience and necessity shall be granted. For the performance of that function the Commission has been entrusted with a wide range of discretionary authority. Interstate Commerce Commission v. Parker, 326 U.S. 60, 65 S.Ct. 1490 [89 L.Ed. 2051]. Its function is not only to appraise the facts and to draw inferences from them but also to bring to bear upon the problem an expert judgment and to determine from its analysis of *the total situation* on which side of the controversy the public interest lies." (Emphasis supplied.)

21. United States v. Pierce Auto Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L. Ed. 821.

In the exercise of this administrative function, there is no specification of considerations by which the Commission is to be governed in determining what the public convenience and necessity require.[22]

It is true that the term "convenience and necessity," through many years of administrative and judicial interpretation, has taken on a definite meaning and connotes a determination of public interest based on the weighing of the various factors affecting adequate and efficient transportation service; but this does not mean that the finding of public convenience and necessity has been reduced to a rigid formula, prescribing the weight to be given each factor in any given situation.[23]

The competitive effect on other carriers which would result from the granting of operating authority to a motor carrier is an element to be considered by the Commission, whether the application be for a new service or for an alternate route; but the weight to be given to competitive effect is a matter within the sound judgment of the Commission in the light of all the other circumstances presented by the specific problem.

The facts of the instant case, as shown by the record, present an exceptional situation. Greyhound was the only interstate carrier serving this area of southern Maryland before Clarke's certificate was granted and was the first carrier authorized to serve the traffic between Washington and Lexington Park. Clarke's certificate was granted at a time when extraordinary wartime conditions in the area justified authorization of two competing carriers. With the return to peacetime conditions, there was an appreciable reduction in the personnel at the Naval Air Station and increased use of private automobiles, with consequent reduction in the volume of passenger traffic in and out of Lexington Park. However, Lexington Park remained the principal source of traffic in the territory. During the year 1947 Greyhound operated at a loss, although between the time Atwood started operations in April, 1946, and January, 1948, when the reopened hearings were held, Greyhound had reduced its schedules from 8 to 3 round trips daily. On the other hand, during the same period, chiefly because of its more direct route over Maryland Highway 235, Atwood was able to maintain its wartime schedule of 9 trips daily and operated at a profit for the year 1947. It is true that Greyhound's own witness testified that fundamentally this portion of southern Maryland should be served by only one carrier; but the facts are that two carriers have been authorized to serve the territory and that the original carrier, Greyhound, is being forced to operate at a loss because of the destructive competition of the newcomer, Atwood, with the result that transportation in the Leonardtown area, served only by Greyhound, is in jeopardy.

On June 30, 1947, Division 5 of the Interstate Commerce Commission issued an order granting Greyhound both routes requested in its original application, namely, service to Piney Point and service over Highway 235 between Mechanicsville and Lexington Park, stopping at intermediate points. Thereafter the hearing on Greyhound's application was reopened at the request of Clarke and Atwood as interveners, in order that they might present evidence to show how transportation conditions in the area had changed since the first hearing in July, 1945. The burden was placed on Clarke and Atwood to show that the changed conditions warranted denial of Greyhound's application.

The evidence presented by the interveners concerned primarily the lack of public need for additional transportation on the Piney Point route and to intermediate points on Highway 235. Although the com-

22. Chesapeake & Ohio Ry. Co. v. United States, 283 U.S. 35, 42, 51 S.Ct. 337, 75 L.Ed. 824; State of Colorado v. United States, 271 U.S. 153, 169, 46 S.Ct. 452, 70 L.Ed. 878.

23. Pyramid Moving Co. v. United States, D.C., 57 F.Supp. 278, affirmed 322 U.S. 715, 64 S.Ct. 1279, 88 L.Ed. 1557: "Facts vary with cases, and the Commission may properly reach varying conclusions therefrom, and it may, within the exercise of the powers entrusted to it, vary its standards and principles of judgment."

petitive effect of the proposed Greyhound operations on Atwood's service was an element to be weighed by the Commission in granting new authority to Greyhound, and although the interveners' petition for reconsideration stated as one of its grounds that "the use of the route in question would irreparably affect the satisfactory service now provided by Atwood," no evidence bearing directly on this point was introduced by Atwood. However, there was testimony as to the operations of Atwood during the preceding year, from which the Commission could form a conclusion as to the competitive situation and the possible effect on Atwood's service of new service by Greyhound.

The interveners' witnesses testified that Atwood was operating 9 round trips daily to Lexington Park and 2 round trips daily to Piney Point, and that the buses were operating at about 50% capacity; that during the first six months of 1947 29-passenger buses were operated and during the last six months 37-passenger buses; that seven new buses had been purchased for the Lexington Park route; that Atwood's operation during 1947 was profitable. No figures as to Atwood's financial condition were introduced, and there was no testimony or exhibit specifically relating to the anticipated effect on Atwood of the proposed new service by Greyhound. One of Atwood's witnesses, a passenger who lived on Highway 235, did testify as to his personal fear that Greyhound would crush Atwood's business if it were authorized to operate over Highway 235, but several of Atwood's witnesses testified that if Greyhound and Atwood were equally available to them they would prefer to use Atwood's service.

The principal witness for Greyhound admitted that he expected that a considerable part of the additional traffic which would warrant operation of new schedules would be drawn from the Lexington Park area and the Naval Air Station, although some of it would come from the intermediate territory on the Leonardtown and Highway 235 routes because of the increased frequency of Greyhound service.

Thus it will be seen that competitive effect, as well as lack of public need, was a ground of Clarke and Atwood's petition to reopen the Greyhound hearing, but the interveners did not produce evidence which would sustain their contention that the anticipated new service would have a destructive effect on Atwood's operations. The testimony at the reopened hearings did show that there was no need for an additional carrier serving the Piney Point route or intermediate points on Highway 235. Thereafter, Greyhound abandoned its application for the Piney Point route, and the Commission granted it authority to operate over Highway 235, without service to intermediate points and as an alternate route for operating convenience only, in view of the obvious economies which could be effected by the shorter route.

It is the purpose of the Motor Carrier Act to prevent destructive competition, but not all competition. The Commission has a duty to prevent entry into the transportation field of destructive competition. But, where a competitive service has been authorized in the belief that it will not be destructive and it becomes clear that because of some unforeseen circumstance the new carrier is endangering other transportation service in the area through no fault of the original carrier, the Commission has the further duty to take stock and, if practicable, to prevent the destructive competition by restoring the situation to a more normal and sound basis—as the Commission did in this case. The order here attacked is designed to remedy destructive competition by Atwood, which, by causing Greyhound to operate at a loss, has endangered the only interstate transportation service to people on the Leonardtown route.

The facts recited in the report and order of Division 5 granting the alternate route, and in the order of the full Commission sustaining Division 5's order, show that the alternate route over Highway 235 would serve no new points, would effect operating economies, and would grant Greyhound no competitive advantage over Atwood, but would merely lessen the disadvantage under which Greyhound (the original carrier) now operates. Division 5 in its order concluded that granting of the alternate route—"would aid in the restora-

tion of the stability of applicant's general operations in Southern Maryland, remove the dangers of impairment of applicant's services elsewhere in Southern Maryland, particularly at and around Leonardtown, and place the *competitive situation* on a more normal and sound basis." This particular conclusion is not specifically carried into the order of the full Commission, but the latter order throughout refers to Division 5's order and is in effect an affirmance of the findings and conclusions of Division 5.

The phrase "competitive situation" clearly connotes the competitive situation as it relates to both competing carriers, Atwood and Greyhound. I find no reason to restrict the ordinary meaning of these words to only Greyhound's operations.

The record of the reopened hearings contains ample evidence to support the Commission's findings and judgment that public convenience and necessity require granting of the alternate route to Greyhound. It is apparent from the record and orders that the Commission acted on a consideration of the need of the whole peninsula and "determine from its analysis of the total situation on which side of the controversy the public interest lies."[24]

I agree that the findings of administrative bodies should be sufficiently clear to enable the reviewing court to ascertain whether the agency's conclusion has a rational basis in its findings and, in turn, to determine whether the findings are supported by the evidence. However, no words of art are required in findings. If upon reading them as a whole it is apparent that the Commission gave consideration to the necessary elements, what facts were found, and that those facts were sufficient to form a reasonable basis for the conclusion reached, even though the findings be not as crystal clear as one might desire, they satisfy the legal requirements. I believe the simple findings of fact recited in the Commission's order in this case require

no explanation, clarification, or additional conclusions of fact, and are sufficient to support the Commission's exercise of its discretion.

This case has been pending for over six years. My associates would remand it to the Commission for further hearing, in order to afford Clarke and Atwood an opportunity to present evidence as to the competitive effect of the alternate route on Atwood's operations.

It is my belief that the interveners, having been accorded a full opportunity to present evidence as to the competitive effect of a new service over Highway 235 and having failed to present convincing evidence on that point, should not now be permitted to reopen the proceedings and delay further Greyhound's authority to operate over Highway 235 as an alternate route, which necessarily would have a less detrimental effect on Atwood's operation than new service would have had.

"Whether a hearing was full, must be determined by the character of the hearing, *not by that of the order entered thereon.* A full hearing is one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law, of the step asked to be taken." [25] That the Commission chose to deny the exact authority requested in Greyhound's application and, deciding the issue of public need in *Atwood's* favor, granted the authority which in its judgment was fair to Greyhound, Atwood, and the public to be served, in the light of all the facts revealed by two days of testimony, does not alter the fact that Atwood and Clarke had a full and fair opportunity to present their contentions and evidence respecting the present transportation situation in the area in question.[26]

It is my belief that administrative proceedings should be brought to an end within a reasonable period of time, and should

24. United States v. Detroit & Cleveland Navigation Co., supra [236 U.S. 236, 66 S.Ct. 77].

25. The New England Divisions Case (Akron C. & Y. R. Co. v. United States),

261 U.S. 184, 200, 43 S.Ct. 270, 277, 67 L.Ed. 605.

26. Consolidated Freightways v. United States, D.C., 83 F.Supp. 811, 814.

598

not be prolonged by the court's interference where the record indicates that all parties have been accorded due process and the administrative body has not exercised its discretion arbitrarily or capriciously or exceeded its authority.

For the foregoing reasons I would deny plaintiffs' complaint for injunction and sustain the order of the Interstate Commerce Commission.