COUNTY OF MARIN et al., Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants, Golden Gate Transit Lines, Pacific Greyhound Lines, and The Greyhound Corporation, Defendants in Intervention.

Civ. A. No. 34985.

United States District Court
N. D. California, S. D.

April 12, 1957.

Spurgeon Avakian, Oakland, Cal., for plaintiffs.

James E. Kilday, John H. D. Wigger, Attys., Dept. of Justice, Washington, D. C., Lloyd H. Burke, U. S. Atty., San Francisco, Cal., for U. S. A.

Robert W. Ginnane, Gen. Counsel, Washington, D. C., for Interstate Commerce Commission.

McCutchen, Thomas, Matthew, Griffiths & Greene, San Francisco, Cal., for Golden Gate Transit, Pacific Greyhound and Greyhound Corp.

Before HEALY, Circuit Judge, and HARRIS and CARTER, District Judges.

OLIVER J. CARTER, District Judge.

This action has been brought to restrain the enforcement of, and to set aside an order of the Interstate Commerce Commission which approved and authorized a plan of the Pacific Greyhound Lines to transfer its San Francisco commuter operation to its new subsidiary, the Golden Gate Transit Lines, hereinafter referred to as "Pacific" and "Golden Gate", respectively. Jurisdiction of this Court is sought under 28 U.S.C. § 2325 and 28 U.S.C. § 2284. The complaint attacks the authority of the Commission to make the order of approval, and has been brought by the counties of Marin, Contra Costa, each of which lies across the bay from San Francisco, and two commuter associations. Named as defendants are the United States and the Interstate Commerce Commission, and these parties, after answering, moved for a judgment on the pleadings. Golden Gate, Pacific, and the parent of Pacific, the Greyhound Corporation, all joining as defendants in

intervention, have moved to dismiss the complaint for failure to state a claim.

Each of these motions raise the same question, whether the Commission was correct in ruling that section 5(2)(a) of the Interstate Commerce Act, 49 U.S. C.A. § 5(2)(a), gave jurisdiction to approve the proposed transaction. That section requires approval of the Commission,

"* * * for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; *or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise;* or for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise;". (Emphasis added.)

It is the meaning of the italicized portion of the section which is in dispute here. The proposal is to transfer the properties and operating rights used to serve the San Francisco Bay Area commuter service, to Golden Gate, and Pacific would concurrently *acquire control* of Golden Gate by taking back all of its capital stock. By the same transaction, Greyhound Corporation, through its ownership of Pacific, would also *acquire control* of Golden Gate. The plaintiffs claim that this does not come within the italicized portion of Section 5(2)(a) because the section was only intended to cover cases where a carrier or carriers seek to acquire control of another *existing* carrier, and that Golden Gate will not acquire a carrier status until

the operating rights of Pacific have actually been transferred to it.

We have no difficulty in finding that the proposed transaction is covered by the language of the section; it merely says that approval of the Commission is required when one carrier acquires control of another. That is precisely what the Greyhound Corporation and Pacific are seeking to do here; although Golden Gate will not attain the status of a carrier until the operating rights of Pacific are transferred to it, neither will the parent corporations acquire control until then, for the properties and operating rights are to be simultaneously exchanged for the stock.

The real thrust in the plaintiffs' argument that the section does not cover the proposed transaction lies in their contention of legislative purpose in enacting this legislation. It is argued that in enacting Section 5 Congress only intended to cover consolidations, unifications, and mergers of carrier control; that there was no intention to cover the case of an existing carrier splitting up its operations, which Pacific seeks to do here. This version of the Congressional intention is buttressed by excerpts showing that Congress, in enacting Section 5, as part of the Transportation Act of 1940, 54 Stat. 905, was endeavoring to inject economic strength into failing carriers, by permitting them to combine and consolidate, providing their plans met with certain other tests.

■ We assume that the dominant purpose of Section 5(2) was to reach cases in which carriers sought to unite their control. But we think the plaintiffs' version of Congressional purpose underlying Section 5 is too narrow, and that it ignores the whole regulatory scheme of the Interstate Commerce Act. Section 5(2)(a) was not newly conceived in the Transportation Act of 1940. We find that Section 5 of the Transportation Act of 1920, 41 Stat. 456, contained provisions substantially like those found in the present statute. While the 1920 Act applied only to railroad carriers, Congress had already determined the

necessity of subjecting transactions affecting carrier control to the scrutiny of the Interstate Commerce Commission. In 1948, the Supreme Court reiterated the purpose of the 1920 Act in Schwabacher v. United States, 334 U.S. 182, 68 S.Ct. 958, 963, 92 L.Ed. 1305, where it said:

"In a series of decisions on particular problems, this Court defined the general purposes of that Act to be the establishment of a new federal railway policy to insure adequate transportation service by means of securing a fair return on capital devoted to the service, restoration of impaired railroad credit, and regulation of rates, security issues, consolidations and mergers in the interest of the public. The tenor of all of these was to confirm the power and duty of the Interstate Commerce Commission, regardless of state law, *to control rate and capital structures, physical make-up and relations between carriers,* in the light of the public interest in an efficient national transportation system. [Citing cases]." (Emphasis added).

So far as it was the purpose of Congress to have the Interstate Commerce Commission control the capital structure, physical make-up and relations between carriers under the power conferred by Section 5, we are unable to read out of the statute the transaction at hand.

We also find support for upholding the jurisdiction of the Commission here in New York Central Securities Corp. v. U. S., 1932, 287 U.S. 12, 53 S.Ct. 45, 46, 77 L.Ed. 138. The question was whether Section 5(2) then applying only to railroad carriers, 41 Stat. 456, and requiring Commission approval when one carrier acquired control of another "either under a lease or by the purchase of stock" reached a transaction where a parent corporation leased the properties of its subsidiary. The Supreme Court held that the leasing constituted an acquisition of control within the language of the Act, over the argument that the parent already controlled the carrier properties through its ownership of the stock of the subsidiary. There was no new control acquired that did not exist before in a different degree, but merely a change in the form of the control. The proposal in the instant case is to change the degree or form of control over the properties of the carrier, by transferring them to the subsidiary Golden Gate, and we think that the above holding requires that it be approved by the Commission under the present Section 5(2).

We find no cases construing the pertinent language of Section 5(2)(a) since it was expanded to include motor carriers, but there are judicial decisions construing comparable provisions in the Civil Aeronautics Act. Section 408 of that Act, 49 U.S.C.A. § 488, provides that:

"(a) It shall be unlawful, unless approved by order of the Board as provided in this section * * * (5) for any air carrier or person controlling an air carrier, any other common carrier, or any person engaged in any other phase of aeronautics, to acquire control of any air carrier in any manner whatsoever;"

In Pan American Airways Co. v. Civil Aeronautics Board, 2 Cir., 1941, 121 F.2d 810, 815, American Export Airlines Inc., organized as a subsidiary to American Export Lines, Inc., a common carrier by water, applied to the Civil Aeronautics Board for a certificate permitting it to do business as an air carrier, and in addition, approval of control of it by its parent American Export Lines, under the above section. The Board dismissed the application for approval of control, on the same theory which plaintiffs invoke here, viz., the control provision did not reach a transaction unless the air carrier sought to be controlled was already an air carrier. Judge Hand rejected this interpretation, reversed the dismissal, and remanded the case to the Board, stating:

"This seems to us an unduly literal interpretation of subdivision

(5). In our opinion 'to acquire control of any air carrier in any manner whatsoever' is to take all steps involved in obtaining control, which in this case would consist in supplying a subsidiary corporation, organized for air carriage and possessing adequate financial resources, with a certificate authorizing operation. Any other interpretation would enable a steamship company, by organizing a subsidiary for air carriage, to escape the requirement of Section 408(b) that the 'Authority shall not enter * * * an order of approval unless it finds that the transaction proposed will promote the public interest by enabling such carrier other than an air carrier to use aircraft to public advantage in its operation and will not restrain competition'".

The reasoning of Judge Hand is equally applicable here. Section 5(2), subdivision (c) of the Interstate Commerce Act supplements Section 5(2)(a) in stating:

"In passing upon any proposed transaction under the provisions of this paragraph (2), the Commission shall give weight to the following considerations, among others: (1) the effect of the proposed transaction upon adequate transportation service to the public; * * * (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected."

If Greyhound is free to make substantial alterations in its corporate structure, to create subsidiaries to take over part of its existing operation, or perhaps to venture into new areas, without the necessity of seeking Commission approval, the function of that body to assure adequate transportation service to the public is unduly restricted.

Finally we note that the Interstate Commerce Commission itself has, on other occasions, ruled that the type of transaction which Pacific Greyhound proposes is a Section 5 transaction. See:

Columbia Motor Service Co.—Purchase —Columbia Terminals Co., 35 M.C.C. 531, and Consolidated Freightways, Inc., —Control—Consolidated Convoy Co., 36 M.C.C. 351, which were decided shortly after Section 5(2) was enacted into its present form. In each of these cases motor carriers sought and obtained Commission approval to transfer a part of their operation to a newly created corporation, whose carrier status had to await the completion of the transaction. See also: Takin—Purchase—Takin Bros. Freight Line, Inc., 37 M.C.C. 626, and Gelhous & Holobinko—Control, 60 M.C.C. 167. The Supreme Court has made itself clear regarding the weight to be given to Commission interpretations of the Interstate Commerce Act. In United States v. American Trucking Associations, 1940, 310 U.S. 534 at page 549, 60 S.Ct. 1059, at page 1067, 84 L.Ed. 1345, it said:

"In any case such interpretations are entitled to great weight. This is peculiarly true where the interpretations involve 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'"

We therefore hold that the Commission was correct in holding that it had jurisdiction to approve the transaction in question, and both motions should be granted.

There remains one further issue to be decided. During the final arguments on the motions to dismiss and for judgment on the pleadings plaintiffs, County of Marin, County of Contra Costa, Marin County Federation of Commuters Clubs, and Contra Costa Commuters Association, asked for permission to amend the complaint. After the motions had been submitted these plaintiffs formally moved the Court for permission to amend the complaint by adding allegations challenging the findings of the Commission that the transaction between Pacific and Golden Gate was con-

sistent with the public interest, and that the Commission abused its discretion in denying plaintiff's petition for rehearing and reconsideration. The effect of the motion to amend is to inject into the case the completely new issue of the sufficiency of the evidence to support the findings of the Commission. The complaint, as originally framed, raised only the issue of jurisdiction, and the motions to dismiss and for judgment on the pleadings were argued and submitted only on that issue. Plaintiffs concede that the proposed amendment attempts to raise issues known to them at the time of the filing of the complaint and at the time of the hearings on the motions. They argue, however, that under the liberal provisions of Rule 15(a) of the Federal Rules of Civil Procedure, 28 U.S.C. the amendments should be permitted.

The motion for leave to amend is addressed to the sound discretion of the Court, and must be decided upon the facts and circumstances of each particular case. It would serve no useful purpose to review the many cases dealing with Rule 15. It is sufficient to say that the power of the Court to permit amendment should not be used to completely change the theory of the case after the case has been submitted to the Court on another theory without some showing of lack of knowledge, mistake or inadvertence on the part of the party seeking amendment, or some change of conditions of which that party had no knowledge or control. Plaintiffs have made no such showing here. The motion to amend is denied.

Counsel for defendants and defendants in intervention are directed to prepare and present orders in conformity herewith.

HARRIS, District Judge (concurring in part and dissenting in part).

(Defendants in intervention Golden Gate Transit Lines and Pacific Greyhound Lines shall be hereinafter referred to as "Golden Gate" and "Pacific" respectively, as in the majority opinion.)

I concur in the majority opinion upholding the jurisdiction of the Commission. I dissent in the refusal of the Court to grant plaintiffs permission to amend the complaint regarding the issue of the sufficiency of the evidence.

The motion to amend the complaint and the proposed amendment itself must be considered in the light of the historical events and proceedings conducted by the defendant in intervention, Pacific, before the California Public Utilities Commission (formerly the Railroad Commission of California).

The granting or refusing to grant leave to amend cannot be viewed in a judicial vacuum, nor can the determination and the exercise of a sound discretion be reached without a regard for the realities, and the background and motives which inspired Pacific to invoke the procedural technique hereafter adverted to.

Particularly is this so by reason of the admission made by Pacific that it invoked the procedure under Section 5(2) of Title 49 U.S.C.A., before the Interstate Commerce Commission, creating Golden Gate, in order to circumvent the rate-making authority and jurisdiction of the California Public Utilities Commission. In short, the foregoing section was availed of as a legal device to avoid not only the proceedings and decisions which will be reviewed immediately hereafter, but as well, the express agreement made by Pacific, which in turn inured or should inure to the benefit of residents and commuters of the bay area communities involved in this litigation.

Judicial notice may be had of the fact that Pacific has appeared before the California Public Utilities Commission on numerous occasions in connection with its operations in Marin and Sonoma Counties.[1] In 1939 it made its application to replace Northwestern Pacific

---

1. 42 Ry.Comm. 372 and 661; 50 PUC 650; 53 PUC 634, etc.

Railroad which was then serving commuters by means of rail and ferryboat service. When many North Bay residents protested at the proposed change, Pacific assured the California Railroad Commission that it would assume the exclusive transportation service on a minimum financial recovery basis. (42 Opinions and Orders of the Railroad Commission of California 661) At page 668 the following language appears in the opinion of the Commission:

"The record, as it now stands, shows conclusively that the Greyhound is the only carrier which is able financially and otherwise to provide Marin County with a service to take the place of that to be abandoned. It has made a firm offer to substitute its proposed service for that of the Northwestern Pacific in event it is granted authority to serve the entire territory to be abandoned by the rail carrier.

"The record shows that the Pacific Greyhound Lines made its proposal not with the thought that it would return the full cost of operation, but that it would realize something over and above the out-of-pocket cost of operation. The inference may be fairly drawn that the decision to embark upon this undertaking was made with some hesitation and only after a long and complete study of its feasibility. It may be that the Pacific Greyhound Lines was influenced to some extent by the fact that if its application were granted and the Northwestern Pacific Railroad authorized to abandon service, the Northwestern Pacific Railroad, a wholly owned subsidiary of the Southern Pacific Company,[4] would be relieved of a substantial continuing out-of-pocket loss.

("(4) The Southern Pacific Company owns approximately 39% of the common stock of the Pacific Greyhound Lines")

"Whatever may have been the underlying reasons which influenced the Greyhound to make this offer is relatively unimportant, as the record leaves no doubt that it was made in good faith and with the avowed purpose of providing Marin County with a satisfactory, adequate, and enduring transportation service. These underlying reasons only become important in evaluating the statement of the Greyhound, heretofore quoted, to the effect that a denial of the right to serve Mill Valley would necessitate a withdrawal of its offer and a resurvey of the entire proposal."

The order of the Commission based upon its pleadings and opinion concluded as a condition for the granting of a certificate of public convenience and necessity that:

"(4) The rights and privileges herein authorized may not be discontinued, sold, leased, transferred, nor assigned unless the written consent of the Railroad Commission to such discontinuance, sale, lease, transfer, or assignment has first been obtained."

At a recent hearing,[2] Pacific admitted that it had agreed to operate without hope of financial reward except the realization of sufficient returns to cover the actual out-of-pocket costs of the North Bay venture.

The foregoing review is significant by reason of the recent Supreme Court decision in Federal Power Comm. v. Sierra Pac. Power Co. (Pacific Gas & Electric Co. v. Sierra Pacific Power Co.), 350 U.S. 348, 76 S.Ct. 368, 372, 100 L.Ed. 388, decided shortly after the instant ruling of the Interstate Commerce Commission.

In setting aside an order of the Commission and remanding the Pacific Gas and Electric Company case, the Supreme

Court held that a public utility may not be relieved of an improvident bargain even though such bargain produces less than a fair rate of return on its investment. The Commission's duty is to protect the *public interest* as distinguished from the *"private interests of the utilities."* A contract is neither unjust nor unreasonable merely because it is unprofitable to the utility. The express agreement of Pacific with the California Railroad Commission dated May 21, 1940, provident or improvident, cannot be ignored.

By parity of reasoning, when the ICC reviews local operations of Pacific it must consider its financial returns in terms of the public interest. Even though income realized from a specific sector is less than a fair rate of return, Pacific is not entitled to relief in the absence of proof of losses (not offset by interstate revenue), which place a burden on interstate commerce.

Plaintiffs in their proposed amendment to the complaint have sought to point out the frailties in Golden Gate, as well as the avoidance on the part of Pacific of the agreement made in the vital proceedings before the California Public Utilities Commission—vital in the sense that the proceedings sought to and did protect the public interest as distinguished from the "private interests of the utilities." Cf. Pacific Gas & Electric Co. v. Sierra Pacific Power Co., supra.

The proposed amendment sets forth and challenges the findings of the ICC as to the financial ability of Golden Gate

to operate. They charge that their limited capital structure—contributed by Pacific—and the narrow scope of their operations preclude economic success. The amendment also challenges numerous findings pertaining to Golden Gate as a carrier, contending that there is no substantial evidence to show that the local operations will support this carrier. If, in fact, such operations now earn a fair return for Pacific, the latter had no basis for complaining about the intrastate drain on its interstate business and the supposed burden placed upon interstate passengers.

Plaintiffs' allegations establish the necessity for a complete hearing and review before this Court.[3] This is especially so in view of the fact that Pacific has undertaken to avoid the consequences of its agreement with the California Public Utilities Commission (see especially pp. 672, 673 of 42 Ry. Comm. of California), by disposing of its local operations to an independent, but wholly owned subsidiary without first obtaining written consent from the California Commission, which is opposed to the transfer.

Under all of the circumstances[4] and in the exercise of a sound and liberal discretion, Rule 15(a), F.R.Civ.P., plaintiffs' motion to amend should be granted, since "justice so requires."[5]

As a matter of alternative relief, consistent with the Supreme Court decision in Pacific Gas & Electric Co. v. Sierra Pacific Power Co., supra, consideration should be given to a remand of said cause to the Interstate Commerce Commission for further proceedings.[6]

3. Cf. Breswick & Co. v. United States, D.C., 138 F.Supp. 123, 137, 138.

4. It should be observed that no defendant will suffer any substantial prejudice by permitting plaintiffs to amend their complaint. The California Public Utilities Commission granted Pacific a rate increase on its local operations shortly after this matter was argued and submitted to the court.

5. Armstrong Cork Co. v. Patterson-Sargent Co., D.C., 10 F.R.D. 534; McDowall v. Orr Felt & Blanket Co., 6 Cir., 146

F.2d 136; Maryland Casualty Co. v. Rickenbaker, 4 Cir., 146 F.2d 751; Lloyd v. United Liquors Corp., 6 Cir., 203 F.2d 789; and L. A. Tucker Truck Lines, Inc., v. United States, D.C., 100 F.Supp. 432.

6. Cf. United States v. Ohio Power Co., 77 S.Ct. 652; Inland Motor Freight v. United States, D.C., 60 F.Supp. 520 (9th Cir.); Clarke v. U. S., D.C., 101 F. Supp. 587; Carolina Freight Carriers Corp. v. United States, D.C., 38 F.Supp. 549.