629 F.2d 467
 ASSURE COMPETITIVE TRANSPORTATION, INC., Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Liberty Trucking Company, Intervenors.
WARREN TRANSPORT, INC., Petitioner,
Common Carrier Conference Irregular Route, Intervening Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Liberty Trucking Company, Intervening Respondent.
ASSURE COMPETITIVE TRANSPORTATION, INC., Plaintiff-Appellant,
v.
INTERSTATE COMMERCE COMMISSION et al., Defendants-Appellees.
 Nos. 79-1867, 79-2033 and 79-2133.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 11, 1980.
Decided Aug. 7, 1980.
 
 Daniel C. Sullivan, Chicago, Ill., Kurt E. Vragel, Jr., Waterloo, Iowa, for petitioner.
 John P. Fonte, I. C. C., Washington, D. C., for respondents.
 Before CASTLE, Senior Circuit Judge, SWYGERT and SPRECHER, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 These three consolidated matters arise from an order of the Interstate Commerce Commission granting an application for additional motor common carrier operating authority, and a district court order dismissing an action challenging the jurisdiction of the Commission to issue that and other orders. The issues presented are:
 
 
 2
 1) Did the district court properly conclude that it lacked subject matter jurisdiction to consider an action challenging the legality of numerous orders of the Commission on the basis that the Commission was illegally constituted?
 
 
 3
 2) Did the Commission correctly determine that a quorum under the Interstate Commerce Act, 49 U.S.C. § 10306(a), is a majority of an existing Commission rather than a majority of a full complement of eleven Commissioners?
 
 
 4
 3) Is the Commission illegally constituted as a matter of constitutional law because the President has unreasonably delayed or intentionally declined to appoint eleven Commissioners?
 
 
 5
 4) Did the Commission, in granting Liberty Trucking Company's application for motor common carrier operating authority, alter the burden of persuasion traditionally required in such cases and if so, was a rule making required?
 
 
 6
 We affirm the district court's dismissal for lack of subject matter jurisdiction. We conclude further that the Commissioner's interpretation of 49 U.S.C. § 10306(a) was correct and that a quorum of the Commission participated in the challenged decisions. The constitutional challenge to the authority of the Commission must fail because the existing Commission was appointed pursuant to law and the Constitution. Whether the President has failed to exercise a nondiscretionary duty by unreasonably delaying or declining to appoint a full complement of eleven Commissioners is not before us because the President is not a party to this action. Finally, we hold that the Commission did not alter the burden of persuasion traditionally placed on applicants for motor common carrier operating authority.
 
 
 7
 * These protracted administrative proceedings began in 1974 when Liberty Trucking Company (Liberty) filed an application for a certificate of public convenience and necessity authorizing it to transport general commodities (with certain exceptions) over regular routes between Chicago and Waterford and Burlington, Wisconsin, and between Burlington and Waterford and Elkhorn, Wisconsin. That application was granted by the Commission's Review Board Number 1 in 1976. On a petition for reconsideration by two of four carriers who had opposed the application, the Commission's Appellate Division 1 reversed the review board and denied the application. Although Liberty's petition for administrative review and for a finding that the proceeding involved an issue of general transportation importance was denied, the Commission on its own motion reopened the proceeding for reconsideration. In October 1978 the entire Commission granted the application. 130 M.C.C. 243 (1978) ("Liberty I ").
 
 
 8
 Two protestants petitioned for administrative review. In addition, Warren Transport, Inc. ("Warren") among other carriers, and Assure Competitive Transportation ("ACT") and the Common Carrier Conference Irregular Route ("Conference"), among other carrier organizations, petitioned to intervene and for administrative review. The intervenors argued that the Commission had violated the Commission's criteria established in Pan-American Bus Lines Operation, 1 M.C.C. 190, 203 (1936), by modifying the burden of persuasion imposed on already-authorized carriers opposing an application for a certificate of public convenience and necessity. By a decision served on June 11, 1979 the Commission granted leave to intervene but denied the petitions for administrative review. 131 M.C.C. 573 (1979) ("Liberty II "). Warren field a petition for judicial review in the Eighth Circuit which was transferred to this court. Conference was granted leave to intervene.
 
 
 9
 On June 20, 1979 ACT filed a petition with the Commission seeking to vacate the agency's decision for lack of jurisdiction. ACT pointed out that under 49 U.S.C. § 10301(b), "the Commission is composed of 11 members" and that under 49 U.S.C. § 10306(a), a quorum is defined as a majority of the Commission. ACT argued that at least six members or a majority of an eleven member Commission are required to transact business. Because only five members participated in Liberty II, ACT contended that the decision was void for lack of a quorum. On July 3, 1979 the Commission denied ACT's motion, citing 49 U.S.C. § 10301(e) which provides: "A vacancy in the membership of the Commission does not impair the right of the remaining members to exercise all of the powers of the Commission."[1] ACT filed a petition in this court seeking judicial review.
 
 
 10
 After the Liberty I decision was entered but before it was affirmed on administrative review in Liberty II, ACT filed a complaint in the United States District Court for the Northern District of Illinois seeking a declaratory order that the Commission was illegally constituted in violation of the Constitution and the Interstate Commerce Act, 49 U.S.C. § 10101 et seq., and asking that the Commission be enjoined from acting until "such time as there is a quorum appointed." ACT also requested that all Commission actions since June 30, 1978 be declared unlawful for want of a quorum. In response to a motion by the defendant Commission, the district judge dismissed the complaint for lack of subject matter jurisdiction, stating that under 28 U.S.C. § 2321 the proper method for challenging the legality of Commission actions was by appropriate review proceedings in the court of appeals.
 
 
 11
 The petitions for review taken from the Liberty II decision and from the Commission's denial of the motion to vacate for lack of jurisdiction as well as an appeal filed by ACT from the district court's order of dismissal were consolidated for purposes of review in this court.
 
 II
 
 12
 We affirm the district court's dismissal of ACT's complaint which alleges that Commission orders since June 1978, when the membership of the Commission fell below six, are nullities as a matter of constitutional and statutory law because those orders were rendered by a Commission of fewer than six members.[2] The statutory provision governing judicial review of Commission actions is 28 U.S.C. § 2321(a), which provides:
 
 
 13
 Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Interstate Commerce Commission shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of the title.[3]
 
 
 14
 The principal exception to section 2321(a) is 28 U.S.C. § 1336, which vests jurisdiction in the district court in cases relating merely to the payment of money. That exception has been narrowly construed. In Island Creek Coal Sales Co. v. ICC, 561 F.2d 1219 (6th Cir. 1977), the court held that an action challenging the power of the Commission to issue certain orders, although also seeking monetary reparations, was not within the narrow exception for money matters only: "Attacks upon the validity of ICC orders are to be filed in the appropriate court of appeals." 561 F.2d at 1222.
 
 
 15
 In the instant case, ACT does not claim that the district court has jurisdiction under the special monetary exception in 28 U.S.C. § 1336. Rather, ACT alleges jurisdiction under 28 U.S.C. § 1337(a) which provides: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce." We do not agree.
 
 
 16
 It is well established that a special statute vesting jurisdiction in a particular court cuts off the jurisdiction other courts might otherwise have under a more general statute. See Venner v. Michigan Central R. R. Co., 271 U.S. 127, 46 S.Ct. 444, 70 L.Ed. 868 (1926). The District of Columbia Circuit has stated:
 
 
 17
 (A)n impressive line of authority supports the . . . proposition that, even where Congress has not expressly conferred exclusive jurisdiction, a special review statute vesting jurisdiction in a particular court cuts off other courts' original jurisdiction in all cases covered by the special statute. See, e. g., Macauley v. Waterman S. S. Corp., 327 U.S. 540, 543-545, (66 S.Ct. 712, 713-714, 90 L.Ed. 839). . . . The Administrative Procedure Act itself provides that "(t)he form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute," except where such review would be inadequate. APA § 10(b), 5 U.S.C. § 703 (1970) . . ..
 
 
 18
 Inv. Co. Inst. v. Bd. of Gov. of Federal Reserve Sys., 551 F.2d 1270, 1279-80 (D.C.Cir.1977) (additional citations omitted). See also REA Express, Inc. v. Alabama Great Southern R. R. Co., 343 F.Supp. 851, 856 (S.D.N.Y.1972), affirmed, 412 U.S. 934, 93 S.Ct. 2774, 37 L.Ed.2d 333 (1973). In this case Congress has provided with particularity that challenges to orders of the Commission are to be brought in the court of appeals. As the Commission notes, if the district court could exercise jurisdiction under 28 U.S.C. § 1337, then section 2321 and its jurisdictional counterpart, 28 U.S.C. § 2342, providing for "exclusive jurisdiction" in the court of appeals, would be completely undermined, for any action challenging the validity of a Commission order is also an action arising under an act of Congress regulating commerce.
 
 
 19
 Public Utilities Commission v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958), cited by ACT, is distinguishable. There the constitutionality of a section of the California Public Utilities Code enforceable by the California Public Commission was challenged by the United States. The Supreme Court held that because the issue was the constitutionality of that statute, it could properly be raised in the district court without first being raised before the Commission. In the instant case, the attempted constitutional challenge described in ACT's brief concerns the failure of the President to appoint Commissioners allegedly in violation of separation of powers principles in the Constitution. That issue is not properly before us because the President is not a party to this action. See infra at 475. There is no constitutional issue concerning the appointment or actions of the existing Commission, which is the only named defendant in this lawsuit.[4] See section IV infra.
 
 
 20
 It is of course true that an agency may not finally decide the limits of its statutory power. Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946). But this is not a case where the agency is the final arbiter, because here review is available in a court of appeals.[5] We distinguish Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), relied on by ACT, because in Leedom, the aggrieved employees could not seek review of the Board's action in another way. Here this court can and does decide the very issue raised in the district court by a petition for review of the Commission's order. See sections III and IV infra.
 
 
 21
 ACT contends that the district court has jurisdiction because not one but many Commission orders are challenged and a general question of law is raised. Those arguments must also be rejected. See Macauley v. Waterman S.S. Corp., 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839 (1946); Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938). In B. F. Goodrich Company v. Northwest Industries, Inc., 424 F.2d 1349 (3rd Cir.), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970), a private action was brought in the district court to enjoin an alleged violation of the Interstate Commerce Act.[6] In affirming the district court's dismissal for lack of jurisdiction, the Third Circuit stated: "The statutory procedure for review is applicable although an order is not directly attacked so long as the practical effect of a successful suit would contradict or countermand a Commission order." 424 F.2d at 1353-54. It is not disputed that the precise effect of a successful suit in the instant case would countermand numerous orders of the Commission.
 
 III
 
 22
 ACT argues that the Commission's order in Liberty II and the subsequent denial of ACT's motion to vacate Liberty II were both nullities because the Commission acted without a quorum, in violation of 49 U.S.C. § 10306(a) which provides inter alia : "A majority of the Interstate Commerce Commission . . . is a quorum for the transaction of business." As ACT reads that section, a majority of the statutorily prescribed eleven person Commission or a minimum of six Commissioners are necessary in order for the Commission to have jurisdiction to transact business. It is conceded that only five members of the Commission participated in Liberty II and only four in the decision to deny the motion to vacate.
 
 
 23
 The Commission denied ACT's motion to vacate for lack of jurisdiction by invoking 49 U.S.C. § 10301(e) which provides: "A vacancy in the membership of the Commission does not impair the right of the remaining members to exercise all of the power of the Commission." Because Congress explicitly allowed for Commission action despite vacancies, the Commission construed the quorum provision together with the vacancy provision as requiring the participation of only a majority of an existing Commission, whatever its number, rather than a majority of a full Commission or six. Five of six Commissioners in office participated in Liberty II and four of six in the decision to deny the motion to vacate, in both cases a majority of Commissioners in office or a quorum according to the Commission's interpretation of the statute.
 
 
 24
 ACT argues that the vacancy provision relied on by the Commission does not "supersede" the quorum provision, so that while vacancies up to five do not prevent the Commission from acting provided a quorum of six exists, more than five vacancies precludes the availability of a quorum. In support of its interpretation, ACT cites FTC v. Flotill Products, Inc., 389 U.S. 179, 88 S.Ct. 401, 19 L.Ed.2d 398 (1967). In that case, the Supreme Court said of the vacancy provision in the Federal Trade Commission Act, 15 U.S.C. § 41, which is virtually identical to the vacancy provision at issue here: "We do not regard the provision in 15 U.S.C. § 41 for the exercise of powers by 'the remaining commissioners' in the case of 'a vacancy' as regulating the matter of a quorum." 389 U.S. 179, 181, n.3, 88 S.Ct. 401, 403.[7] ACT reads FTC v. Flotill Products, Inc. as supporting its view that the vacancy provision in the Interstate Commerce Act, 49 U.S.C. § 10301(e), although allowing the Commission to act without its full complement of eleven members, cannot be interpreted as affecting the number of Commissioners required for a quorum.
 
 
 25
 Moreover, ACT contends, the fact that the Commission is powerless to act with more than five temporary absences would make it an "absurdity" if the Commission could act with more than five permanent absences. Finally, ACT asserts that defining a quorum as a majority of the Commissioners, however few in number they are, allows for Presidential control of the Commission through nonappointment of Commissioners, in complete derogation of the constitutional mandate that Congress and not the President is to regulate commerce. U.S.Const. Art. I, § 8, cl. 3.
 
 
 26
 We conclude that ACT's interpretation of the quorum provision is not correct. We agree with the Commission that a majority of the Commissioners actually in office constitutes a quorum.
 
 
 27
 It is undisputed that the vacancy section, 49 U.S.C. § 10301(e), vests in a Commission with fewer than eleven members the full power of a Commission of eleven. From the explicit language of that provision, we are persuaded that Congress intended those Commissioners in office, however many there are, to be "the Commission" for all purposes. "A majority of the Commission," the phrase used in the quorum provision, accordingly must mean a majority of those Commissioners in office.
 
 
 28
 The language from FTC v. Flotill Products, Inc., 389 U.S. 179, 88 S.Ct. 401, 19 L.Ed.2d 398 (1967), relied on by ACT, does not compel a different result. In that case, the issue was not the definition of a quorum, but rather the number of Federal Trade Commissioners who had to concur in a decision. The Supreme Court began its opinion by noting that the Federal Trade Commission Act did not contain a quorum provision (although the Federal Trade Commission had enacted a quorum rule), and then in a footnote made the statement cited by ACT, to the effect that the vacancy provision in the Act did not regulate the matter of a quorum. We read that statement to mean that the vacancy provision was not a substitute for a quorum provision, because as the footnote went on to state, in other statutes Congress created specific quorum provisions where they were intended.[8] ACT would have us believe that the Supreme Court has indicated that a vacancy provision can never affect the matter of a quorum, but we cannot agree with that interpretation. We read the Flotill dicta to mean that the vacancy provision in the Federal Trade Commission Act was not a substitute for a quorum provision, and therefore the Commission's quorum rule was valid under the law. It does not mean that where, as in our case, there is both a vacancy provision and a quorum provision, the vacancy provision cannot be utilized in construing the language in the quorum provision requiring "a majority of the Commission."
 
 
 29
 Moreover, it is not an "absurdity" for six temporary absences to disable the Commission while six permanent absences do not. "The requirement of a quorum is a protection against totally unrepresentative action in the name of the body by an unduly small number of persons." Robert's Rules of Order, § 3, p. 16 (1970). If the Commission consists of eleven Commissioners and only five participate in the decision, less than fifty percent of the existing decision-making body has actually made the decision. It is not that the number five is too small; it is that five Commissioners do not adequately represent the views of a Commission that is in fact comprised of eleven. In the case of a Commission of six, however, five participating Commissioners represent more than eighty percent of the existing decision-making body and thus their decision does not result in the kind of unrepresentative action which the quorum provision was designed to prevent.
 
 
 30
 The Commission refers us to 19 U.S.C. § 1330(c)(6), the quorum provision enacted by Congress when it created the six member International Trade Commission: "A majority of the Commissioners in office shall constitute a quorum . . . ." (emphasis added). There Congress explicitly permitted action by a majority of members currently in office, discrediting ACT's contention that fewer than a majority of a full Commission is an "absurdity" Congress would never permit.[9]
 
 
 31
 Further support for our conclusion exists in the legislative history of section 10327(k)(1) of the Interstate Commerce Act, 49 U.S.C. § 10327(k)(1), formerly section 17(9)(f)(i). Section 17(9)(f)(i) required "not less than seven of the Commissioners" to agree on extensions of time in which to complete certain extraordinary rail proceedings. In 1978 the Commission advised Congress that it then had only seven members, and with one impending resignation, it would have only six. The Commission was concerned that the seven Commissioner requirement would render its power to extend certain deadlines a nullity. Thus the Commission recommended that the statute be amended to permit "a majority of the Commissioners" to authorize such extensions:
 
 
 32
 This would modify the existing requirement that more than a simple majority vote for an extension, but would make the statute more adaptable to situations such as presently exist. Also, it would be more workable in situations where, for example, one or more Commissioners are absent due to illness or vacation plans.
 
 
 33
 Letter from Acting Chairman Betty Jo Christian to Senator Howard Cannon and Representative Harley Staggers (August 25, 1978). On November 8, 1978 Congress amended the language in accordance with the Commission's suggestion. Pub.L.No. 95-611, § 5, 92 Stat. 3090. Because the amendment was intended to establish the Commission's ability to act with only six members in office, even if one or more Commissioners was absent, we are clear that Congress used the language "a majority of the Commission" to mean a majority of the existing Commission. Significantly, the language in the amended section 10327 tracks the language of the quorum provision.
 
 
 34
 We conclude that a quorum under the Interstate Commerce Act, 49 U.S.C. § 10306(a), is a majority of an existing Commission, whatever its number.
 
 IV
 
 35
 Apart from the issue of the quorum, which is a matter of statutory construction, ACT attempts to raise a constitutional challenge to the legality of the existing Commission to transact business. Although it is conceded that by statute the Commission is not barred from acting with vacancies, ACT contends that a Commission with fewer than eleven Commissioners is operating in violation of the Constitution when the President has either intentionally declined or unreasonably delayed in making appointments. ACT adduces some evidence tending to show that the President's failure to appoint eleven Commissioners has been intentional. Moreover, ACT argues that the unreasonableness of the delay in appointing the full complement of Commissioners was established as a matter of law as of June 1978, when only five Commissioners remained whose terms had not expired and the membership fell below what ACT contends is a quorum.
 
 
 36
 ACT's constitutional challenge is based on the following provisions of the Constitution which are allegedly being violated: Art. II, § 2, cl. 2 (vesting in the President the power of appointment); Art. II, § 3, cl. 4 (requiring that the President "take care that the laws be faithfully executed"); Art. I, § 8, cl. 3 (providing that Congress shall regulate Commerce). ACT argues that the President has violated a nondiscretionary duty to appoint Commissioners, and as a consequence, he rather than the Congress is controlling commerce in violation of the separation of powers principles in the Constitution. The existing Commission, argues ACT, is therefore illegal.
 
 
 37
 We conclude that ACT's constitutional challenge is misdirected. The fact is that the existing Commissioners are each sitting pursuant to the specifications laid down by Congress, having been appointed by the President with the concurrence of the Senate. In addition, it was Congress which enacted the very provision that enables the Commission to exercise all its powers despite vacancies. 49 U.S.C. § 10301(e).
 
 
 38
 The problem, if there is one, lies not with the existing Commissioners, who have been validly appointed, or with the existing Commission, which is authorized by statute to act with vacancies. The only arguable illegality is on the part of the President, who may be, as alleged, intentionally or unreasonably failing to appoint a full complement of Commissioners. In so withholding his power of appointment, ACT asserts, the President is effectively legislating a different size Commission than the eleven member Commission prescribed by Congress.[10]
 
 
 39
 It is clear that the President is not completely immune from judicial process for the sole reason that he is President. Our attention is called to the district court decision in Minnesota Chippewa Tribe v. Carlucci, 358 F.Supp. 973 (D.D.C.1973), in which the plaintiffs sought to compel the President to appoint members of the National Advisory Council on Indian Education pursuant to the Indian Education Act, 20 U.S.C. § 1221g. The court held that the President had discretion to choose whom to appoint, but not discretion to decide that the Council should not be constituted, because the appointment of the Council was not an executive, discretionary or political act. See also McQueary v. Laird, 449 F.2d 608, 611 (10th Cir. 1971) (mandamus will issue to require the exercise of permissible discretion).
 
 
 40
 We need not be detained by the complex issues that would involve us here were this a proper action alleging that the President was acting illegally and asking that he be compelled to make the requisite number of appointments to the Commission. This is not a mandamus action where the President has been made a party defendant.[11] ACT states that it has deliberately chosen not to bring a mandamus action, because it seeks to invalidate past acts of the Commission rather than to compel future acts of the President. However, we have concluded that the Commission's actions are not invalid on the basis of too few Commissioners and will not be invalid so long as the existing Commissioners have been validly appointed and the vacancy provision of the Interstate Commerce Act remains in effect. Thus the attempted constitutional challenge to the jurisdiction of the Commission must fail. We express no opinion as to the likelihood of success of a mandamus action.
 
 V
 
 41
 Petitioner Warren Transport, Inc. (Warren) and intervenor Common Carrier Conference Irregular Route (Conference) attack the reasoning, though not necessarily the result, in the Liberty I and Liberty II decisions. 130 M.C.C. 243 (1978) and 131 M.C.C. 573 (1979).[12] Warren argues that the Commission has altered the burden of persuasion imposed on applicants for motor carrier operating authority pursuant to section 10921 and 10922 of the Interstate Commerce Act, 49 U.S.C. §§ 10921 and 10922, from what it traditionally was under the Commission's decision in Pan-American Bus Lines Operation, 1 M.C.C. 190 (1936). Further, according to Warren, requiring protesting carriers to prove material harm from a grant of the application violates section 556(d) of the Administrative Procedure Act, 5 U.S.C. § 556(d) which provides:
 
 
 42
 Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof.
 
 
 43
 Finally, Warren and intervenor Conference contend that the Commission has changed the burden of persuasion without complying with the rule making provisions of the Administrative Procedure Act, 5 U.S.C. § 553.
 
 
 44
 The Commission responds first and foremost that it has not altered the burden of persuasion from what it has traditionally been. Moreover, the Commission asserts that its policy of requiring protestants to establish adverse material harm to defeat an applicant's prima facie case is firmly rooted both in section 556(d) of the Administrative Procedure Act, 5 U.S.C. § 556(d), and judicial precedent. Finally, the Commission argues that even if we find that it did alter the burden of proof or establish new standards, a rule making was not required. Because we agree with the Commission that no departure from precedent occurred in the Liberty cases, we do not reach the rule making issue.
 
 
 45
 In Pan-American Bus Lines Operation, 1 M.C.C. 190, 203 (1936), the Commission stated:
 
 
 46
 The question, in substance, is (1) whether the new operation or service will serve a useful purpose, responsive to a public demand or need; (2) whether this purpose can or will be served as well by existing lines or carriers; and (3) whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.
 
 
 47
 In Liberty I, the Commission applied those three criteria and found that applicant Liberty had demonstrated a public need that could not be satisfied by other carriers, in satisfaction of the first two Pan-American criteria. Next the Commission addressed the third criterion and concluded that the protesting carriers had failed to demonstrate that approval of the application would have a material adverse effect on existing operations.
 
 
 48
 Warren and Conference assert that by requiring that the protestant show material harm in order to prevent the granting of the application, the Commission departed from its past practice of imposing the burden of proving all three Pan-American criteria on the applicant. We have read each of the cases cited by the petitioners, and we cannot agree that it was Commission practice to require the applicant to bear the burden of showing the absence of material harm to existing carriers. As we read those decisions, what an applicant was always required to prove was that there was a public need for the new transportation service. See Mitchell Transport Inc. Extension Fly Ash., 124 M.C.C. 303 (1976); Dealers Transit, Inc., Extension Wisconsin, 123 M.C.C. 191 (1975); Herrin Trans. Co. Extension Pensacola, Fla., 82 M.C.C. 133 (1959); Sauers Extension East Cambridge, Mass., 61 M.C.C. 65 (1952). In no case did the Commission state that an applicant had the burden of proving the absence of material harm to existing carriers. In fact, in Herrin Trans. Co. Extension Pensacola, Fla., supra, in which the Commission did discuss and find material harm to existing carriers, it was clearly the protestants who made the showing and not the applicant who failed to show the reverse.
 
 
 49
 The Commission, asserting that it has never required the applicant to bear the burden of proving that no material harm will ensue to existing carriers, cites its decision in Consolidated Freightways Corp. of Del., Extension Phoenix Area, 108 M.C.C. 379, 384 (1969) in which it was stated that once a public need for the service was shown, the Commission required "convincing evidence that the proposed services would in all probability prevent an existing carrier from meeting its obligation to the public, or that the quality of overall service provided in the particular area served would be seriously threatened." In Freeport Transport, Inc., Extension Insulation, 121 M.C.C. 66, 71 (1975), the Commission granted an application because a need for the service was demonstrated and the protestants had "not specifically shown that their operations (would) be affected adversely by our grant of the authority." See also, P. C. White Truck Line, Inc., Extension Atlanta, Ga., 129 M.C.C. 1, 9 (1978).[13]
 
 
 50
 Petitioner Warren also asserts that placing the burden of proving adverse material harm on the protestants violates section 556(d) of the Administrative Procedure Act, 5 U.S.C. § 556(d), which provides:
 
 
 51
 Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. . . . A sanction may not be imposed or a rule or order issued except . . . supported by and in accordance with the reliable, probative and substantial evidence.
 
 
 52
 The legislative history of that provision demonstrates that Congress did not intend always to burden an applicant with proving every factor the Commission would consider in making its decision. The Senate Report states:
 
 
 53
 That the proponent of a rule or order has the burden of proof means not only that the party initiating the proceeding has the general burden of coming forward with a prima facie case but that other parties, who are proponents of some different result, also for that purpose have a burden to maintain. Similarly the requirement that no sanction be imposed or rule or order be issued except upon evidence of the kind specified means that the proponents of a denial of relief must sustain such denial by that kind of evidence.
 
 
 54
 S.Rep.No. 752, 79th Cong., 1st Sess. 22 (1945), U.S.Code Cong. Serv. 1946, p. 567 (emphasis added). The House Report says of section 556(d): "In other words, this section means that every proponent of a rule or order or the denial thereof has the burden of coming forward with sufficient evidence therefor." H.R.Rep.No. 1980, 79th Cong., 2d Sess., 34 (1946) (emphasis added).[14] So clear a legislative intent will not be overridden by the fact that the word "proponent" is used in the statute. See United States v. American Trucking Ass'ns, 310 U.S. 534, 543-44, 60 S.Ct. 1059, 1063-1064, 84 L.Ed. 1345 (1940); Aviation Consumer Action Project v. Washburn, 535 F.2d 101 (D.C.Cir.1976).
 
 
 55
 On judicial review, the courts have upheld the Commission's practice of requiring protestants to bear the burden of showing material harm:
 
 
 56
 (T)he Court in Clarke v. United States, 101 F.Supp. 587, 594 (D.D.C.1951), concluded that the burden of proving any alleged adverse effect in the transportation industry resulting from the issuance of a common-carrier certificate should be placed on the protestants. The reasoning in Clarke has been adopted by the Second Circuit in the review of other administrative agencies, Eastern Airlines (Eastern Airlines v. Civil Aeronautics Board), supra, 271 F.2d at 759 & n.15, and this Court sees no reason to adopt any other rule.
 
 
 57
 . . . The Protestants must bear the burden of proving everything within their knowledge to the effect that public convenience and necessity require that the certificate not be issued.
 
 
 58
 Trans-American Van Service, Inc. v. United States, 421 F.Supp. 308, 331 (N.D.Tex.1976). In May Trucking Co. v. United States, 593 F.2d 1349, 1356 (D.C.Cir.1979), the District of Columbia Circuit upheld a Commission grant of authority, stating that the burden was on the protestant to demonstrate not only that the applicant would compete and divert some of their business, but also that the new operation would actually promote inefficiency and waste or destroy the protestant's ability to compete.
 
 
 59
 We also cannot agree with petitioners that the Liberty I or II decisions indicate that the Commission will automatically grant an application unless there is a showing of material harm. In Liberty I and II, the Commission made clear that it was granting the application because Liberty had met its burden of proving the first two Pan-American criteria and the protestants had failed to show sufficient harm. If the petitioners are asserting that absent a showing of need, an application would still be granted if there was no showing of harm, we would have to reject that argument as totally unsupported by the Liberty decisions.[15] Thus, the petitioner's contention that the ultimate burden of persuasion in motor common carrier applications is on the protestants is without merit. "Applicants for motor common carrier authority have the burden of establishing affirmatively that the present or future public convenience and necessity requires their proposed operations." Mayfield Sons Trucking Co., Extension Spotsylvania, 129 M.C.C. 432, 434-435 (1978).[16]
 
 
 60
 Petitioners argue that the language in the Liberty decisions imposes so severe a burden on a protestant as to approach a requirement that the protestant demonstrate that he will go bankrupt if the application is granted. The Commission's conception of the value of increased competition, it is urged, has now made that factor almost impossible to outweigh. We respond first by noting that it was only three years ago that two circuits, including this one, reversed and remanded Commission decisions for failing to adequately consider the benefits of additional competition. Sawyer Transport, Inc. v. United States, 565 F.2d 474 (7th Cir. 1977); P. C. White Truck Line, Inc. v. Interstate Commerce Commission, 551 F.2d 1326 (D.C.Cir.1977). Thus increased attention to the importance of competition may at least in part result from rather than violate judicial instruction. We do not find support for petitioners' contentions in either the facts or the language of the Liberty decisions.
 
 
 61
 Far from granting an application despite a finding of material harm to protesting carriers, in Liberty I the Commission found protestants' assertions of harm to be only "vague and speculative." 130 M.C.C. at 247. The Commission did go on to explain that even a showing of material harm may be outweighed by an overriding public benefit from the additional service. That language, however, does not diverge from the third Pan-American criterion as formulated in 1936: "(W)hether (a useful purpose) can be served by applicant with the new operation or service proposed without endangering or impairing the operation of existing carriers contrary to the public interest." 1 M.C.C. at 203 (emphasis added).[17] Citing numerous decisions of the Commission, the District of Columbia Circuit recently stated:
 
 
 62
 Injury to existing carriers through competition becomes relevant only when there is corresponding injury to the public. Congress designed the Interstate Commerce Act to benefit the people, not to create protected monopolies for those who profess to serve the public.
 
 
 63
 May Trucking Co. v. United States, 593 F.2d 1349, 1356 (D.C.Cir.1979) (footnotes omitted). Necessarily, the Commission's view of what the public interest demands has and will change over time. But the burden has remained on the applicant to demonstrate a need for the new service and on the protestant to prove material harm sufficient to outweigh that public need.
 
 
 64
 The petitions for review are denied and the district court decision appealed from is affirmed.
 
 
 
 [1]
 Only four Commissioners participated in the denial of the motion to vacate, and the legality of that decision is also challenged here
 
 
 [2]
 Although the President made additional appointments subsequent to the filing of the ACT's complaint, in its brief ACT argues that a Commission with fewer than eleven members is illegal as a matter of law because the President is unreasonably delaying or intentionally declining to appoint a full complement of eleven Commissioners
 
 
 [3]
 Section 2321(a) was enacted in 1975 at which time Congress eliminated the three-judge district court procedure for review of Commission orders and transferred that jurisdiction to the court of appeals. Pub.L. 93-584, 88 Stat. 1917
 
 
 [4]
 In its complaint, ACT asserted that the Commission acted without a quorum which denied ACT due process of the law under the Fifth Amendment of the Constitution. The quorum issue is one of statutory construction, see section III infra, and the due process allegation, not discussed in ACT's brief, is without merit
 
 
 [5]
 An agency may rule on its authority in the first instance. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)
 
 
 [6]
 At that time, review of Commission orders was provided by three-judge courts pursuant to then 28 U.S.C. § 2325
 
 
 [7]
 While the Federal Trade Commission Act did not specify the number of Commissioners necessary for a quorum, a rule of the Commission provided that a majority of the Commission constituted a quorum
 
 
 [8]
 The Interstate Commerce Act is cited as an example, a statute containing both quorum and vacancies provisions
 
 
 [9]
 We reject the alternative argument from 19 U.S.C. § 1330(c)(6) that where Congress intends a quorum to be a majority of those in office, it enacts a provision that says so specifically, and that otherwise a majority must be whatever number represents a majority of a full Commission. It can just as easily be said that when Congress has intended to authorize a quorum consisting of a fixed number, it has done so expressly. See, e. g., Civil Aeronautics Board, 49 U.S.C. § 1321(c) (three of five); Federal Communications Commission, 47 U.S.C. § 154(h) (four of seven)
 
 
 [10]
 Section 10301(b), 49 U.S.C. § 10301(b), provides:
 The Commission is composed of 11 members appointed by the President, by and with the advice and consent of the Senate.
 
 
 [11]
 Only the President has been given the power to appoint Commissioners and he has not delegated that authority
 
 
 [12]
 The challenged language in Liberty I reads:
 Will the proposed service cause protestants to suffer competitive harm of such degree as to outweigh the benefits to the general public? We conclude it will not. To make this determination we must "weigh the competing interests." That is, we must balance the benefits flowing to the shipping and consuming public against the destructive impact a new service might have on existing carriers. Our ultimate concern, of course, is the public interest, and it is to determine the public interest that we undertake this balancing test. It should not be forgotten that a finding of potential harm to protestants is not the end of our analysis. It is, in fact, only a beginning.
 Stated differently, and from a protestant's perspective, the ultimate question might be whether protestant's evidence has established an interest worthy of regulatory protection from competition. Realistically, in order to stand a chance of prevailing, a protestant in most instances must convince us that the new competition is likely to materially jeopardize existing carriers' ability to serve the public. And, even then, it is quite possible that the benefits of heightened competition and new or imposed service may outweigh the potentially substantial harm to protestant.
 We recently discussed protestant's evidentiary burden in P. C. White Truck Line, Inc., Ext. Atlanta, Ga., 129 M.C.C. 1, 9 (1978), where we noted that a protestant must introduce more than mere evidence of revenues it may lose to applicant. Such evidence demonstrates little more than that a protestant is operating under its authority something it is legally obligated to do anyway. Protestants should also indicate how the potential loss of revenues will affect their operations. However, we must point out that we cannot simply presume traffic diversion or revenue loss. A protestant has the additional burden of offering some explanation of why or how authorization of a competitive service will lead to substantial traffic diversion and material revenue loss. This requires something more than a showing of traffic moving under authority in conflict with that sought.
 
 
 [130]
 M.C.C. at 245-46
 The challenged language in Liberty II reads:
 Once an applicant establishes a prima facie need for service, an absolute burden for an applicant, we then evaluate protestant's interest in the proceeding. A protestant is, and has always been, required to demonstrate an interest conflicting with the authority sought and its ability to fulfill the public need. Then after that threshold showing, a protestant must demonstrate that its conflicting interest is worthy of protection for the proposed competitive service. Our prior decision merely reaffirms this process, including the appropriate evidentiary showing expected of a protestant. See, e. g., P. C. White Truck Line v. I. C. C., 551 F.2d 1326 (D.C.Cir.1977); and Consolidated Freightways Corp. of Del., Ext. Phoenix, 108 M.C.C. 379, 384 (1969).
 Petitioners' criticism of the evidentiary burden we impose upon a protestant is unfounded. The day is past when conflicting authority coupled with pertinent traffic abstracts will alone suffice to deny an application for operating rights. Superior Trucking Co., Inc., Ext. Agric. Machinery, 126 M.C.C. 292 (1977). It is reasonable to require more from a protestant than a showing that the applicant might offer competition. Our prior decision appropriately requires that a protestant demonstrate how new competition might materially jeopardize its ability to serve the public. Further, we noted that injury to a protestant is not the end of our inquiry. After such a showing, we must determine if injury to a protestant would be contrary to the public interest.
 
 
 [131]
 M.C.C. at 574-75
 
 
 [13]
 It is not disputed that an applicant must establish a prima facie case as specified in Novak Contract Carrier Application, 103 M.C.C. 555, 557 (1967), but that showing has never included proof of a lack of harm to existing carriers. An applicant must show the commodities shipped, the origin and destination points, the volume of traffic, the existing available service and deficiencies in existing service. Novak Contract Carrier Application, supra
 
 
 [14]
 See K. Davis, Administrative Law Text § 14.12, at 287 (3d ed. 1972)
 
 
 [15]
 Similarly, the post-Liberty decisions cited by petitioners have all found a need for the service before granting the application
 
 
 [16]
 We note that the Supreme Court describes the Commission's role in deciding whether to grant authority not as determining whether an applicant has sustained a burden of persuasion but rather as "weigh(ing) the competing interests and arriv(ing) at a balance that is deemed 'the public convenience and necessity.' " Bowman Transp. v. Ark.-Best Freight System, 419 U.S. 281, 293, 95 S.Ct. 438, 445, 42 L.Ed.2d 447 (1974). That language supports the Commission's suggestion that it may not be bound by formal burden of proof requirements but instead is to evaluate the totality of factors. In that connection we note that in Appleyard's Motor Transp. Co. v. I.C.C., 592 F.2d 8, 11 (1st Cir. 1979), the First Circuit has stated that the Pan-American criteria, at issue in this case, are "a guideline, not a strait jacket."
 
 
 [17]
 In Liberty II, the Commission did not reverse the ultimate burden as petitioners assert; rather that decision reiterates that a protestant has a burden to bear, once a need has been shown