635 F.2d 1301
 11 Envtl. L. Rep. 20,458
 ASSURE COMPETITIVE TRANSPORTATION, INC., Petitioner,
Red Arrow Freight Lines, Inc., J. H. Rose Truck Line, Inc.,
C&G Transportation Co. Inc., and Billy Frank d/b/a Frank
Bros., Arrow Truck Lines, Inc., Charter Express, Inc.,
Dixie-West Express, Inc., et al., Intervening Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
AMERICAN TRUCKING ASSOCIATIONS, INC., Petitioner,
B and P Motor Lines, Inc., Donney Motor Express, Inc.,
Watkins Motor Lines, Inc., Arrow Truck Lines,
Inc., Charter Express, Inc., and
Dixie-West Express, Inc., et
al., Intervening Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
National Industrial Traffic (the League), Party Respondent.
 No. 79-2308, 79-2391.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 19, 1980.
Decided Dec. 30, 1980.
 
 Gregory A. Stayart, Chicago, Ill., Kenneth E. Siegel, Washington, D. C., for petitioner.
 Lawrence I. Richman, McDermott Will & Emery, Chicago, Ill., for Nat. Indus. Traffic.
 Before FAIRCHILD, Chief Judge, SWYGERT, Circuit Judge, and CAMPBELL, Senior District Judge.*
 SWYGERT, Circuit Judge.
 
 
 1
 On October 17, 1979, the Interstate Commerce Commission issued a policy statement that modified the traditional criteria used by the Commission in deciding whether to grant an application for a certificate of public convenience and necessity authorizing motor common carrier operations under section 10922 of the Interstate Commerce Act, 49 U.S.C. § 10922.[1] Petitioners challenge the Commission's action as unlawful on the basis that:
 
 
 2
 1) the new decisional standards contradict the applicable provisions of the Interstate Commerce Act, 49 U.S.C. § 10922, and existing case law;
 
 
 3
 2) the new standards are arbitrary and capricious and are not supported by substantial evidence;
 
 
 4
 3) the Commission has violated section 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C), section 382(b) of the Energy Policy and Conservation Act of 1975, 42 U.S.C. § 6362(b), and its own regulations by failing to prepare environmental and energy impact statements.[2]
 
 
 5
 * In December 1978, the Commission published notice of its intention to adopt a policy statement modifying the criteria used to decide motor common carrier applications. Specifically, the Commission proposed eliminating the second of the three Pan-American criteria, "whether (the useful public purpose to be served by the new service) can and will be served as well by existing lines or carriers," in order to give more weight to the benefits of competition and emphasize less the protection of existing carriers.[3]
 
 
 6
 The Commission received extensive public response to its proposal, including comments from numerous carriers, carrier organizations, shippers, shipper organizations, and state and federal government agencies. In October 1979, the Commission decided to adopt the policy statement as proposed. It was published in the Federal Register on October 19, 1979, to become effective in 30 days.
 
 
 7
 Assure Competitive Transportation, Inc. (ACT), American Trucking Associations, Inc. (ATA), and several motor carriers petitioned the Commission for administrative review, and ATA filed a motion with this court for judicial stay. On November 20, 1979, we entered a temporary stay, but on November 30, 1979 we vacated the stay and denied ATA's request. On January 18, 1980, the Commission denied the petitions for administrative review and issued a Notice stating that the new policy statement would be applied in motor common carrier application proceedings published in the Federal Register on or after November 30, 1979.
 
 
 8
 The petitions for judicial review filed by ACT, ATA, and intervening petitioners have been consolidated. The National Industrial Traffic League is an intervening respondent.
 
 II
 
 9
 Petitioner ATA and intervenors assert that the elimination of the second Pan-American criterion violated the Interstate Commerce Act, 49 U.S.C. § 10922, and relevant case law interpreting that statute.[4] We do not agree. Section 10922, 49 U.S.C. § 10922, does not on its face require that consideration be given to whether the purpose to be served by the new service can be served as well by existing carriers. Rather it provides that the Commission shall issue a certificate of motor common carrier authority if the Commission finds, inter alia, that "the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity." 49 U.S.C. § 10922(a)(2). Nowhere does the statute define "public convenience and necessity."
 
 
 10
 The purpose of Congress was to leave to the Commission authoritatively to decide whether additional motor service would serve public convenience and necessity.... This, of course, gives administrative discretion to the Commission ... to draw its conclusion from the infinite variety of circumstances which may occur in specific instances.
 
 
 11
 Interstate Commerce Commission v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 1492, 89 L.Ed. 2051 (1945) (citations omitted).
 
 
 12
 In fact, the Commission was specifically directed to administer its statute in light of the nation's changing needs:
 
 
 13
 ... (T)he Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice.... In fact, ... this kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.
 
 
 14
 American Trucking Ass'ns, Inc. v. Atchison, T. & S.F. Ry., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967).
 
 
 15
 Interpreting the "public provision and necessity" language in a predecessor provision to section 10922, the Commission in Pan-American Bus Lines Operations, 1 M.C.C. 190, 203 (1936) determined that:
 
 
 16
 the question, in substance, is (1) whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; (2) whether this purpose can and will be served as well by existing lines or carriers; and (3) whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.
 
 
 17
 As the Commission explained in proposing the policy statement at issue here, the second Pan-American criterion articulated a "protectionist" policy adopted to promote the sound development of the motor carrier industry at a time when that industry was in its infancy. In light of the present maturity of the industry and substantially changed economic conditions, the Commission has in recent years found that the public convenience and necessity required that more weight be given to the benefits of healthy competition and less to protecting existing carriers.[5] That change of emphasis is clearly within the Commission's discretion so long as applications are granted on the basis of a finding that the transportation is required by the present or future public convenience and necessity. The elimination of the second Pan-American criterion results from the Commission's determination that the public convenience and necessity no longer requires observing a protectionist policy appropriate for a different time. Further, to the extent that existing carriers require protection from competition that would endanger their ability to perform service needed by the public, the third Pan-American criterion offers that safeguard:
 
 
 18
 ... whether (a useful public purpose) can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.
 
 
 19
 (emphasis added.)
 
 
 20
 The contention that the new policy violates existing case law is also without merit. Petitioners, alleging that the elimination of the second Pan-American criterion will result in decisions being made solely on the basis of the benefits of competition, remind us that in Bowman Transp. v. Ark.-Best Freight System, 419 U.S. 281, 298, 95 S.Ct. 438, 448, 42 L.Ed.2d 447 (1974) (citation omitted), the Supreme Court stated:
 
 
 21
 The Commission, of course, is entitled to conclude that preservation of a competitive structure in a given case is overridden by other interests....
 
 
 22
 Petitioners also cite an opinion by this court rejecting a Commission decision for considering only one factor. Sawyer Transport, Inc. v. United States, 565 F.2d 474 (7th Cir. 1977).
 
 
 23
 We cannot accept the suggestion that by eliminating the second Pan-American criterion, the Commission intends to consider only the benefits of competition. According to the new test for deciding what service is required by the present and future public convenience and necessity:
 
 
 24
 (1) An applicant must demonstrate that the service proposed will serve a useful public purpose, responsive to a public demand or need.
 
 
 25
 (2) The Commission will grant common carrier authority commensurate with the demonstrated need unless it is established by those opposing the application that the entry of a new carrier into the field would endanger or impair the operations of existing common carriers contrary to the public interest.
 
 
 26
 Those standards, restatements of the first and third Pan-American criteria, satisfy the Commission's duty to "weigh the competing interests and arrive at a balance that is deemed 'the public convenience and necessity' " Bowman Transp. v. Ark.-Best Freight System, 419 U.S. 281, 293, 95 S.Ct. 438, 445, 42 L.Ed.2d 447 (1974). Under the new standards, an application will still be denied if it is established that the entry of a new carrier would endanger or impair the operations of existing carriers contrary to the public interest. Moreover, applicants must still demonstrate a public need for the service.
 
 
 27
 In Bowman Transp. v. Ark.-Best Freight System, the Supreme Court did state that the benefits of competition could be "overridden by other interests," but the Court went on to hold that "where, as here, the Commission concludes that competition 'aids in the attainment of the objectives of the rational transportation policy,' ... we have no basis for disturbing the Commission's accommodation." 419 U.S. at 299, 95 S.Ct. at 448 (citation omitted). In Sawyer Transport, Inc., this court criticized the Commission for considering only one factor but that factor was not the benefits of competition; rather it was the adequacy of existing service, the criterion being eliminated here. In Sawyer, we specifically directed the Commission to give increased consideration to whether additional competition would serve the public convenience and necessity. The elimination of attention to the adequacy of existing service as an independent policy factor does not violate existing case law but rather conforms to the mandate of this and other courts that the Commission consider the benefit of additional competition to the public, despite the adequacy of existing service. Sawyer Transport, Inc. v. United States, 565 F.2d 474, 478-9 (7th Cir. 1978); P. C. White Truck Line, Inc. v. ICC, 551 F.2d 1326, 1328 (D.C.Cir.1977); Trans-American Van Service, Inc. v. United States, 421 F.Supp. 308, 324 (N.D.Tex.1976).
 
 III
 
 28
 Next it is argued that the new policy statement is unlawful because it is neither rational nor supported by substantial evidence. Because we agree with the Commission that the challenged pronouncement is a policy statement rather than a new rule, our review is limited to ascertaining whether the Commission's action was "arbitrary, capricious, (or) an abuse of discretion...." 5 U.S.C. § 706(2)(A).[6] That standard of review is highly deferential and requires affirmance if a rational basis exists for the agency's decision. Ethyl Corp. v. Environmental Protection Agency, 541 F.2d 1 (D.C.Cir.), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).
 
 
 29
 The Commission explained its need for a policy change in terms of the enormous growth of the motor carrier industry in the forty-four years since the Pan-American decision was issued. Those changes in the industry were amply documented by the Commission and if not common knowledge, are surely a matter within the Commission's expertise. Any argument that there was no rational basis for the Commission's action lacks merit.
 
 IV
 
 30
 Finally it is argued that by failing to prepare environmental and energy impact statements, the Commission has violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C), the Energy Policy and Conservation Act of 1975 (EPACA), 42 U.S.C. § 6362, and its own regulations. The Commission and intervenor National Industrial Traffic League respond first by contending that petitioners lack standing to assert their challenge on environmental grounds, because petitioners do not assert an injury and because their interest is not within the zone of interest to be protected by NEPA. In Churchill Truck Lines, Inc. v. United States, 533 F.2d 411 (8th Cir. 1976), the Eighth Circuit held that certain carriers seeking to set aside a Commission order lacked standing to challenge the Commission's failure to issue an environmental impact statement because the carriers' sole motivation was economic self-interest, making them "singularly inappropriate parties to be entrusted with the responsibility of asserting the public's environmental interest...." 533 F.2d at 416. The carriers in Churchill did not allege any environmental injury to themselves.
 
 
 31
 In our case, petitioner ACT asserts that it is not merely a collection of competing truckers but a diverse group including shippers, owner-operators, financial institutions, insurance companies, drivers, and lawyers as well as motor carriers. Its largest group of members is composed of owner-operators and drivers, persons, according to ACT, "who are concerned about the pollution and traffic accidents they witness and must live with everyday." ACT itself, however, as described in its brief, is an "Illinois non-profit corporation organized for the purpose of preserving surface transportation essentially within its existing regulatory framework, subject to orderly modernization." (emphasis added.)
 
 
 32
 Assuming without deciding that ACT has standing to raise the environmental issue, we do not agree that the Commission erred in failing to issue an environmental impact statement. Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2) (C), requires the preparation of an impact statement only for "major federal actions significantly affecting the quality of the human environment." This court and others have consistently held that an agency's determination that an environmental impact statement need not be filed must stand unless it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Nucleus of Chicago Homeowners Ass'n v. Lynn, 524 F.2d 225 (7th Cir. 1975), cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); First National Bank of Chicago v. Richardson, 484 F.2d 1369, 1381 (7th Cir. 1973); Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).[7]
 
 
 33
 Petitioners argue that the policy statement represents a substantial departure from existing motor carrier law and thus is a major federal action within the meaning of NEPA. We cannot agree with petitioners that the departure from prior Commission law is major. First, the Commission and the courts had previously indicated that the adequacy of existing service did not preclude new entries, and the Commission was already granting 98% of the applications before the new policy statement was issued. Second, the adequacy of existing service was never more than one factor among several to be considered in weighing the competing interests.
 
 
 34
 We also do not agree with petitioners that the change in policy significantly affects the environment. Although more applications may be granted, there is no reason to think that motor carriers will travel more vehicle miles as a result of the new policy. For that to be the case, there must be either more freight to be carried or increased inefficiency in the transportation of existing freight. The volume of freight is determined by the industry and consumer demands, not by the number of different carriers doing the transporting. Moreover, the basis of a policy favoring freer entry is that the competition will drive the less efficient out of business and will result in a survival of the best and therefore most efficient operations. In short, the new policy should increase the competition for the existing traffic, not the amount of traffic existing. For us to agree with the petitioners, we would have to believe that existing carriers will continue to drive the same amount of mileage even if some of their traffic is diverted to new entrants. That would be expensive and ultimately self-destructive. We hold that the Commission did not abuse its discretion in determining that its new policy would not significantly affect the quality of the human environment.[8]
 
 
 35
 Petitioners assert that the Commission has violated its own environmental regulations. 49 C.F.R. § 1108.1 et seq. We have already decided that the Commission was within its discretion in concluding that the new policy statement would not significantly affect the environment. Thus, section 1108.8, 49 C.F.R. § 1108.8, is inapplicable. Neither do we find that section 1108.9, 49 C.F.R. § 1108.9, requires an environmental impact statement in this case. That section lists actions which "normally do not require an E(nvironmental) I(mpact) S(tatement)." The Commission made an explicit determination that its new policy would not significantly affect the quality of the human environment, and we will not disturb that decision.
 
 
 36
 Petitioners' contention that a statement of energy impact was required similarly lacks merit. Section 382(b) of the Energy Policy and Conservation Act of 1975, 42 U.S.C. § 6362(b), provides that the Commission
 
 
 37
 ... where practicable and consistent with the exercise of (its) authority under other law, include in any major regulatory action (as defined by rule by each agency) taken by such agency, a statement of the probable impact of such major regulatory action on energy efficiency and energy conservation.
 
 
 38
 Petitioners argue that the policy statement falls within the Commission's enumerated "major regulatory actions," 49 C.F.R. § 1106.5, as a "rulemaking ... affecting carrier operations," or within the more general definition of major regulatory actions as
 
 
 39
 any other activity undertaken, approved or licensed by the Commission which has the potential for a major impact on the conservation of energy resources or upon energy efficiency or which may have a broad effect on the operations of the surface transportation industry.
 
 
 40
 49 C.F.R. § 1106.3(e).
 
 
 41
 First, we note that the pronouncement at issue is a policy statement and not a rulemaking. Moreover, the problem with petitioners' argument that the Commission's action is a major regulatory action has already been discussed in connection with the Commission's failure to issue an environmental impact statement. The new policy, it is true, does permit the entry of additional carriers, but it does not create additional traffic. We therefore hold that the Commission reasonably concluded that there would be no significant effect on energy consumption.
 
 
 42
 The petitions for review are denied.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The Motor Carrier Act of 1980, Pub.L.No. 96-296, § 5, 94 Stat. 794, amended section 10922(a)(2) of the Interstate Commerce Act, 49 U.S.C. § 10922(a)(2), with respect to motor common carriers of property who have applied for certificates on or after July 1, 1980
 
 
 [2]
 Petitioner Assure Competitive Transportation, Inc. (ACT) also alleges that the Commission is illegally constituted with less than a full complement of 11 members and that the President has abused his discretion by failing to make appointments. Those issues were decided by this court in Assure Competitive Transportation, Inc. v. United States, 629 F.2d 467 (7th Cir. 1980)
 
 
 [3]
 According to Pan-American Bus Lines Operation, 1 M.C.C. 190 (1936), the Commission decided whether to grant motor common carrier applications on the basis of:
 (1) whether the new operation or service will serve a useful public purpose, responsive to a public demand or need;
 (2) whether this purpose can and will be served as well by existing lines or carriers; and
 (3) whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.
 
 
 [1]
 M.C.C. at 203
 
 
 [4]
 Section 10922, 49 U.S.C. § 10922, provides:
 (a) Except as provided in this section and section 10930(a) of this title, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II or III of chapter 105 of this title as a motor common carrier or water common carrier, respectively, if the Commission finds that
 (1) the person is fit, willing, and able
 (A) to provide the transportation to be authorized by the certificate; and
 (B) to comply with this subtitle and regulations of the Commission; and
 (2) the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity.
 
 
 [5]
 In the years since the Motor Carrier Act of 1935 was enacted, the regulated industry has matured into one of the most profitable, diverse, competitive, and best managed in the United States
 ... Today's conditions require a change in (the Pan-American) test. The criteria are overly protective for a mature and financially healthy industry, and they tend to restrain healthy competition. The third part of the Pan-American test, which provides existing carriers with protection from competition which would endanger their abilities to continue to perform service needed by the public, offers what we are convinced is a sufficient degree of protection to carriers already in a particular market.
 Notice of Proposal of Interstate Commerce Commission to Issue a Statement of General Policy, Ex Parte No. MC-121, Policy Statement on Motor Carrier Regulation.
 
 
 [6]
 Petitioner's contention that the Commission action is a rule rather than a policy statement lacks merit. Although the distinction between the two is "enshrouded in considerable smog...," Noel v. Chapman, 508 F.2d 1023, 1030 (2d Cir.), cert. denied, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), courts have generally employed two criteria to decide whether an agency pronouncement is a rule or a policy statement. First, a policy statement must operate only prospectively. Texaco v. Federal Power Comm'n, 412 F.2d 740 (3rd Cir. 1969); see also Pacific Gas & Electric Co. v. Federal Power Comm'n, 506 F.2d 33 (D.C.Cir.1974). Second, a policy statement must leave the agency some freedom in which to exercise discretion; it must not be a "binding norm." Pacific Gas & Electric Co. v. Federal Power Comm'n, 506 F.2d at 38
 It is not disputed that the pronouncement was issued as a policy statement and had only prospective effect. We are also persuaded that its implementation leaves room for agency discretion. This court has recently noted that the Pan-American criteria are " 'a guideline not a strait jacket.' " Assure Competitive Transp., Inc. v. United States, 629 F.2d 467 (7th Cir. 1980), quoting Appleyards Motor Transp. Co. v. ICC, 592 F.2d 8, 11 (1st Cir. 1979). Long before the present elimination of the second Pan-American criterion, it had been clear that the adequacy of existing service, including the ability of existing carriers to supply projected service, did not preclude the grant of authority to an applicant. ICC v. Parker, 326 U.S. 60, 70, 65 S.Ct. 1490, 1495, 89 L.Ed. 2051 (1945); Hilt Truck Line, Inc. v. United States, 532 F.2d 1199, 1203 (8th Cir. 1976). Simply stated, the second Pan-American criteria was never a binding norm. In recent years, the adequacy of existing service has been given little weight in the balancing process as the Commission has more and more recognized the public need for increased competition. Moreover, by eliminating the adequacy of existing service as an independent policy consideration, the Commission has not foreclosed all consideration of existing service. Harm to existing carriers contrary to the public interest is, under the second criteria of the new policy, a basis for denying an application.
 Petitioner ATA relies on the District of Columbia's recent decision in American Bus Ass'n v. United States, 627 F.2d 525 (D.C.Cir.1980), but that case is distinguishable. There the purported "policy statement" did not operate only prospectively; in addition, the court found that the statement was a "flat rule of eligibility" rather than "a general pronouncement of the broad policy considerations which will motivate the Commission as it addresses itself to its appointed tasks." (citations omitted.)
 It is self-evident that a change in policy must either eliminate something old or add something new, but we are persuaded that here the Commission has no more stated a binding, inflexible rule than did the previous Commission policy which was comprised of three rather than two Pan-American criteria. Thus the "substantial evidence" standard of review is inapplicable, and the statement must be upheld if it is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We have already concluded that the new policy does not violate any law.
 
 
 [7]
 The Commission concluded simply that "this decision does not significantly affect the quality of the human environment or energy consumption." Although we have before required that a decision not to file an environmental impact statement be supported by a record sufficiently developed to permit judicial review, Nucleus of Chicago Homeowners Ass'n v. Lynn, 524 F.2d 225 (7th Cir. 1975); First National Bank of Chicago v. Richardson, 484 F.2d 1369 (7th Cir. 1973), we have also stated:
 This is not to suggest that in every case arising under this section that the responsible federal agency must articulate in writing the reasons why no environmental statement was filed.
 Scherr v. Volpe, 466 F.2d 1027, 1032 (7th Cir. 1972) (citation omitted).
 The Commission's reasons for declining to file an environmental impact statement must be given when a new project is proposed, for then we must decide whether the environmental effects peculiar to that project have been considered. Nucleus of Chicago Homeowners Ass'n was such a case because there the location of scattered-site public housing was at issue, as was First National Bank of Chicago v. Richardson, which involved the construction of a federal parking garage and detention center in downtown Chicago.
 The instant case is different because here the Commission has changed only its formula for deciding who can compete for business. While the new policy may mean business is distributed differently, it creates no new business to distribute. The change from a protectionist philosophy to one favoring competition allows more carriers to compete for the existing business, but only the winners drive the routes now driven by those few carriers heretofore protected from new entries. In short, the new policy may result in a change in the names on the sides of the trucks, but it will not result in an increase in the number of trucks on the road. This is not a case where the Commission was required to explain in greater detail its conclusion that the new policy would not significantly affect the environment.
 
 
 [8]
 Nor do we find any support for the argument that the new policy will result in diversion of traffic from rail and barge to motor carrier. Nowhere is it suggested that shippers deem motor carrier service superior to other modes but have been prevented from using motor carriers because of a dearth of motor carrier service. Thus it would appear that if shippers presently using other modes wanted motor carriers, they would be using them now. The contention that unsafe vehicles will be pressed into service also must be rejected; carriers seeking new authority must show both a need for the service and that they are "fit, willing and able to provide the transportation to be authorized." 49 U.S.C. § 10922(a)(1)(A)